# EXHIBIT A



**TAS / CAS**
TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE



RECU le

2 9 SEP. 2025

<u>By courier</u>

Mr Matthias Scherer
Ms Laura Azaria
Mr Thomas Widmer
LALIVE SA
Rue de la Mairie 35
1207 Geneva, Switzerland
<u>mscherer@lalive.law; twidmer@lalive.law</u>
<u>lazaria@lalive.law; ludovic.agassiz@fim.ch</u>
<u>sara.moreno@fim.ch</u>

Lausanne, 26 September 2025/SR/vm

**Re:    CAS 2022/O/8974 Fédération Internationale de Motocyclisme (FIM) v. Feld Entertainment & Feld Motor Sports**

Dear Madam, dear Sirs,

Please find enclosed, by courier, a certified true copy of the Arbitral Award notified to the Parties on 6 April 2023.

Please be advised that I remain at your disposal for any further information.

Yours faithfully,

Sophie ROUD
Counsel to the CAS

Enc.



**TAS / CAS**
TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

**CAS 2022/O/8974 Fédération Internationale de Motocyclisme (FIM) v. Feld Entertainment, Inc. and Feld Motor Sports, Inc.**

### ARBITRAL AWARD

issued by the

### COURT OF ARBITRATION FOR SPORT

sitting in the following composition

President:    Ms Jennifer Kirby, Attorney-at-law in Paris, France

Arbitrators:   Mr Alexander McLin, Attorney-at-law in Lausanne, Switzerland

Mr Michele A. R. Bernasconi, Attorney-at-law in Zurich, Switzerland

in the arbitration between

**Fédération Internationale de Motocyclisme (FIM)**, Mies, Switzerland
Represented by Mr Matthias Scherer, Mr Thomas Widmer, Ms Laura Azaria, Attorneys-at-law in Geneva, Switzerland

—Claimant—

and

**Feld Entertainment, Inc.**, Vienna, VA, United States of America
Represented by Mr Michael Bader, Mr Oliver Gnehm, Ms Juliane Hogrefe, Attorneys-at-law in Bern, Switzerland; Mr Charles T. Kimmett, Attorney-at-law in Washington, DC, United States of America; Ms Tara M. Vold, Attorney-at-law in Tysons, VA, United States of America

—Respondent 1—

and

**Feld Motor Sports, Inc.**, Vienna, VA, United States of America
Represented by Mr Michael Bader, Mr Oliver Gnehm, Ms Juliane Hogrefe, Attorneys-at-law in Bern, Switzerland; Mr Charles T. Kimmett, Attorney-at-law in Washington, DC, United States of America; Ms Tara M. Vold, Attorney-at-law in Tysons, VA, United States of America

—Respondent 2—

COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

## I. PARTIES

1. The Fédération Internationale de Motocyclisme ("**Claimant**" or "**FIM**") is a Swiss association with its headquarters in Mies, Switzerland. Claimant was created in 1904 and has been the world governing body for motorcycling sports recognized by the International Olympic Committee ("**IOC**") since 2000. It is also the umbrella association of 116 motorcycling national federations, including the American Motorcyclist Association ("**AMA**"), which has been the national federation for the United States of America ("**United States**" or "**US**") since 1970.

2. Feld Entertainment, Inc. ("**FE**") is a company incorporated in the United States and involved in producing and presenting live touring family entertainment experiences. Its properties include Monster Energy AMA Supercross, a supercross championship series held in the United States. Feld Motor Sports, Inc. ("**FMS**") is a wholly-owned subsidiary of FE that is also incorporated in the United States. Together, FE and FMS are referred to as "**Respondents**" or "**Feld**".

## II. FACTUAL BACKGROUND

3. This award contains a concise summary of the relevant facts and allegations based on the parties' submissions, correspondence and evidence adduced throughout the procedure. Additional facts and allegations found in the parties' written submissions, correspondence and evidence may be set out, where relevant, in connection with the legal discussion that follows. While the Panel has carefully considered all the parties' submissions, correspondence and evidence that has been treated as admissible in the present procedure, this award refers only to the matters that are necessary to explain the Panel's reasoning and conclusions.

4. The contract at the center of this case originally concerned two motorcycling sports:

   *Moto*cross (or "**MX**"), which involves off-road motorcycles competing on dirt tracks outdoors, and

   *Super*cross (or "**SX**"), a variant of motocross that involves off-road motorcycles competing on constructed dirt tracks with steep jumps and obstacles that are typically built inside sports stadiums.

5. Supercross was invented in the United States and held its first title race at the Los Angeles Coliseum ("**LA Coliseum**") in 1972. Racers from outside the United States have participated since 1974 when supercross became an organized series sanctioned by the AMA.

6. The first FIM-sanctioned supercross event took place over a decade later in 1985 and was called the "Trophée Rodil", which officially became a FIM supercross world championship seven years later in 1992.

7. Almost a decade after that, in February 2001, Claimant and a Spanish company called Dorna Off Road S.L. ("**DOR**") entered into an agreement under which Claimant engaged DOR to promote three of its world championship events—namely, the (1) "Motocross World

COPIE CERTIFIEE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

Championship", (2) "Motocross des Nations" and (3) "Supercross World Championship" ("**Agreement**").[1]  These three world championship events are together referred to as the "**World Championships**".

8.   The Panel notes that the World Championships at issue here are only a subset of many world championship events Claimant has sanctioned in a wide variety of motorcycle disciplines since 1949.  Moreover, at the time Claimant and DOR entered into the Agreement, the only so-called world championship motorcycle events that existed—and that had ever existed—were those Claimant sanctioned.

9.   Further to the Agreement, DOR was to act as the "Promoter" of the World Championships, managing and exploiting the "rights of audio-visual transmission and recording, as well as the marketing, promotion and commercial rights" of the World Championships.

10.  For these rights, DOR was to pay Claimant an annual fee in two installments on 30 June and 30 September of each year.  In exchange, DOR got to keep all of the income derived from the World Championships.

11.  Further to Clause 2.4 of the Agreement, and subject to Claimant's prior approval, DOR had the right to negotiate and enter into a sponsorship agreement for the title of each of the World Championships "provided that the name FIM Motocross or Supercross World Championship or Motocross des Nations is retained in the title."

12.  Further to Clause 2.6 of the Agreement, and also subject to Claimant's prior approval, DOR had the right to use the copyrights on the logos for the World Championships.  In this connection, Claimant assigned to DOR all titles on the logos registered as per Appendices 1 and 2 to the Agreement.  The logos pictured in Appendices 1 and 2 were the following:





---

[1] All quotations are set forth "as is".  Any typographical or grammatical errors are in the source documents, as is any bolding, italicizing or underscoring, unless otherwise indicated.

COPIE CERTIFIEE CONFORME
CERTIFIED TRUE COPY

CAS 2022/O/8974 – Page 4

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

13.   The Panel notes that about two years before, in December 1998, Claimant had registered the above-mentioned two marks in Switzerland. Those registrations expired in 2008 (supercross) and 2018 (motocross).

14.   In June 1999, about six months after registering the two marks in Switzerland, Claimant filed applications with the US Patent and Trademark Office ("**USPTO**") to register them in the United States. In those applications, Claimant disclaimed exclusive rights to MX, SX, MOTOCROSS WORLD CHAMPIONSHIP and SUPERCROSS WORLD CHAMPIONSHIP and made no claim to the exclusive right to use those terms apart from the marks as shown. Claimant ultimately abandoned those applications in May 2002, however, and the two marks were never registered in the United States.

15.   Under Clause 2.6, DOR also had the right to register new logos, as well, and was required to "revert to the FIM all titles and rights on the logos and trademarks related" with the World Championships that it might own upon termination of the Agreement.

16.   Clause 2.11 provided that, upon the Agreement's expiry, DOR "shall lose all the rights granted by the FIM under this Agreement which said rights shall automatically revert to the FIM."

17.   Clause 4.2 of the Agreement addressed the way in which Claimant and DOR would work together to establish the calendar of events for each of the World Championships. That same Clause also confirmed that, subject to its terms, "nothing contained in this Agreement may be considered as restricting the rights of the FIM to be the governing body of the Championships."

18.   Clause 6 of the Agreement provided as follows:

*The FIM rules, and in particular the sporting and technical rules relating to the* [World] *Championships, shall apply to the organization of the* [World] *Championships. The FIM may alter its rules at its own discretion and in accordance with its own internal procedure. It nevertheless undertakes to agree with DOR before making any alteration to the technical and sporting rules which directly affect the* [World] *Championships events, in conformity with the present Agreement.*

*In addition, DOR must, in fulfilling its obligations under this Agreement, observe all present and future codes and rules of the FIM, particularly its Statutes, Sporting Code and its Appendices. In particular, DOR must observe the spirit of sportsmanship advocated by the FIM.*

*Upon signature of the Agreement, copies of the relevant texts shall be sent to DOR. The FIM shall give DOR notice in writing of any alteration, addition or variation to the Statutes, Sporting Code and its Appendices within the fifteen (15) days following to the date of the FIM decision. If the FIM fails to do so it shall not be entitled to make any claim against DOR based on the latter's failure to observe the said rules and codes.*


COPIE CERTIFIEE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

19. By its terms, the Agreement was originally due to expire on 31 December 2011. Further to an amendment executed shortly after the Agreement was signed, the term of the Agreement was extended until 30 June 2021.

20. Upon expiry of the Agreement, and subject to certain exceptions not at issue in this case, Clause 10.4 provided that "all rights granted under this Agreement shall automatically revert to the FIM and DOR shall not have any rights or obligations herein pursuant to said agreement."

21. In December 2001, DOR partially assigned the Agreement to Clear Channel Entertainment—Motor Sports ("**Clear Channel**") for DOR and Clear Channel to jointly promote the Supercross World Championship ("**Clear Channel Assignment**"). At that time, Clear Channel was the owner and promoter of 15 supercross motorcycle events in the United States sanctioned by the AMA that had "long been recognized as the premier supercross series" ("**US Supercross Championship**"). Working together, DOR and Clear Channel planned to coordinate and integrate the US Supercross Championship and the Supercross World Championship "into a single world-championship series to be known as the FIM Supercross World Championship", with Claimant sanctioning all of the events.

22. The press release from Clear Channel and DOR announcing the arrangement noted that Claimant was the "only recognized body to govern motorcycling events at the international level." The combination of Claimant, DOR and Clear Channel was expected to provide the "strongest base possible to now expand the tradition and success of [Clear Channel's] Supercross program to the international level" [internal quotation marks omitted]. Charlie Mancuso, the president of Clear Channel's motor sports division, said that Clear Channel had "produced supercross racing events for 27 years and always dreamed of elevating our Supercross Series from a domestic championship to one that is worldwide. Realizing that dream could not have been possible without partners like FIM and [DOR]." In this regard, Mr Mancuso said that he particularly wanted to "acknowledge the support of the FIM, which for nearly a century has been recognized as the world's foremost motorcycle sanctioning body, and whose affiliation will help immensely to continue to grow the sport."

23. The Panel notes that the Clear Channel Assignment also solved a practical problem Clear Channel was facing at the time. Before the Clear Channel Assignment, the US Supercross Championship had always been sanctioned by the AMA. In 2001, however, the AMA threatened to cease sanctioning the US Supercross Championship. Further to the Clear Channel Assignment, Claimant became an alternative sanctioning body for the US Supercross Championship, thereby neutralizing the AMA's threat. Thereafter, the AMA did not follow through on its threat to stop sanctioning the US Supercross Championship.

24. About a year and half later, in May 2003, Claimant and DOR amended the Agreement such that DOR returned to Claimant the rights to promote the Motocross World Championship and Motocross des Nations—the two motocross events—and retained only the rights to promote the Supercross World Championship. Relatedly, Claimant and DOR agreed to reduce by 50% the annual fee DOR was to pay Claimant under the Agreement.


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

25.    Sometime prior to 30 October 2007, DOR and Clear Channel assigned their rights under the Agreement to promote the Supercross World Championship to Live Nation Motor Sports, Inc. ("**Live Nation**")—a spin-off from Clear Channel.

26.    On 30 October 2007, Claimant and Live Nation amended the Agreement to combine all of the supercross events Live Nation was promoting—namely, the US Supercross Championship and the Supercross World Championship—into a "single, unified supercross world championship" that would be co-sanctioned by Claimant and the AMA and "conducted in accordance with the FIM Supercross Rulebook," under terms and conditions that were agreed between Claimant and the AMA. The "Combined Championship" would be entitled "(Title Sponsor) AMA Supercross" and marketed and branded as a "FIM World Championship". As Monster Energy was the Title Sponsor, the official title beginning with the 2008 season was "Monster Energy AMA Supercross, an FIM World Championship" and remained so for the rest of the term of the Agreement.

27.    The Panel notes that this amendment refers to the Agreement as the "FIM Sanctioning Agreement" and the annual fee due to Claimant under the Agreement as the "sanctioning fee". It appears that this is the first time the Agreement and the annual fee are described in this way.

28.    Almost a year later, in September 2008, FE acquired all of the outstanding stock of Live Nation with Claimant's consent and approval and changed Live Nation's name to FMS. In seeking Claimant's approval for the acquisition, FE agreed that, following the acquisition, it and Live Nation would "continue to discuss with FIM plans for the expansion of the Supercross World Championship" and Live Nation offered Claimant certain payments in exchange for Claimant's signing off on the transaction.

29.    Following the acquisition, the parties worked together amicably for almost 13 years until the Agreement expired in accordance with its terms on 30 June 2021. During this time, Monster Energy AMA Supercross took place as a FIM World Championship almost exclusively in the United States.

30.    In March 2020, Claimant had offered to extend the term of the Agreement through the 2022 season, but FMS ultimately declined. In this regard, FMS said that it had "desired for several years to grow the sport of Supercross, including the development of an international component to supplement and/or expand the season that is raced in the United States", but the COVID pandemic had made this impossible for the foreseeable future. FMS said that it would "continue to focus its efforts on the domestic Supercross season accordingly."

31.    In anticipation of the expiry of the Agreement in June 2021, Respondents began removing references to "FIM" from its content and internally considered that "Monster Energy Supercross [would] no longer be an 'FIM World Championship' but rather 'Championship'".

32.    On 29 June 2021, one day before the Agreement expired, Claimant and Respondents both announced the end of their collaboration through press releases. In that regard, Claimant stated that Monster Energy AMA Supercross would "revert back to a domestic series from next season onward" under the control of the AMA, and Respondents stated that the AMA would "continue in its current role as the domestic sanctioning body."


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

33. These press releases prompted a series of articles in the specialized press. Racer X said that, as Claimant would no longer be involved with sanctioning Monster Energy AMA Supercross, the "World Championship designation will be dropped". Along the same lines, BikeSales said that the "promoter responsible for AMA Supercross has ended its agreement with the FIM after nearly two decades, meaning the series will lose its status as an official World Championship." MOTOonline similarly said that "Monster Energy Supercross will revert to solely being a national championship from 2022 after series promoter [FMS] split with the FIM", while MX Large likewise said that the Monster Energy SX Championship would revert back to a "domestic series".

34. About five months later, on 7 December 2021, Claimant entered into an agreement with an Australian company called SX Global Pty Ltd ("**SX Global**") under which SX Global became the promoter of the Supercross World Championship effective 1 January 2022 ("**SX Global Contract**"). SX Global is backed by Mubadala Capital, a United Arab Emirates sovereign wealth fund.

35. On 10 December 2021, FE sought Claimant's consent to use Claimant's logo in a video game based on the 2021 Monster Energy AMA Supercross season. Claimant did not agree in light of the SX Global Contract and FE said that it would accordingly not use "FIM or FIM World Championship marks in the video game". Internally, FE made sure that "[w]e're all clear with removing the FIM logo and 'FIM Championship' from the series logo" and "replac[ing] the 2021 Series logo with the 2022 Series logo (with just 'Championship')".

36. On 15 December 2021, Claimant sent FE a cease-and-desist letter concerning a graphic FE used to advertise its video pass to the 2022 Monster Energy AMA Supercross season that incorporated the expression "FIM World Championship" and referred to riders competing for the "2022 World Title". Claimant contended that the "use of FIM titles e.g. FIM World Championships or Prizes, 'Grand Prix', 'World Cup' or any other description of a meeting which implies a World status, and/or use of the terms 'International' or 'Championship' as title or subtitle is reserved for meetings which are accordingly inscribed in the FIM Calendar." Claimant considered that the advertising at issue violated its intellectual property rights and would "illegally mislead the public about the status of the domestic supercross championship Feld is promoting in 2022." Claimant also noted that the domain names "fimsupercross.com" and "worldsupercross.com" were still active and redirected to a website with the domain name "supercrosslive.com" managed by FE. Claimant asked FE to disactivate the domain names "fimsupercross.com" and "worldsupercross.com" and return them to Claimant.

37. FE responded the same day, "Thank you for flagging the graphic. This was inadvertent. We will update and correct it as soon as possible."

38. In addressing the graphic at issue, FE internally questioned, "What would be correct words to use in leu of 'World Championship'? What they racing towards?" and considered that it would "need to change the copy of 'winning a world title' in the social copy." In correspondence with an outside partner, FE noted that Claimant was "very sensitive to our usage, and so all logo's, specifically promoting the 2022 season, need to just say 'Championship'."



TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

39.  On 19 December 2021, Claimant issued a press release announcing that SX Global would be its new promoter for the "FIM Supercross World Championship".

40.  About two weeks later, on 3 January 2022, Claimant sent FE another cease-and-desist letter concerning other graphics FE used in advertising its video pass to the 2022 Monster Energy AMA Supercross season, which again incorporated the expression "FIM World Championship". Claimant said that it considered this advertising to violate its intellectual property rights.

41.  That same day, FE removed the references to "FIM World Championship" from the advertising at issue.

42.  About a month and a half later, on 15 February 2022, Claimant sent FE a third cease-and-desist letter. There, Claimant objected to FE's use in any media of the word "World" (or similar) in connection with any supercross events and, specifically, the expressions "Supercross World Championship", "FIM World Championship", "World Champion", "World Supercross", "Grand Prix", "GP", "Supercross Grand Prix", "World Championship of Supercross", "2022 World Title of Supercross" and "FIM World Championship". Claimant also objected to Respondents using FIM titles such as "FIM World Championships", "FIM Prizes", "FIM Grand Prix" and "FIM World Cup", as well as its use of the domain names "supercrossgrandprix.com", "supercrossgp.com" and, as previously mentioned, "fimsupercross.com" and "worldsupercross.com". Claimant contended that, "[i]n the area of motorcycling sports, the titles of 'World' championships are the exclusive property of the FIM", which is the "sole owner entitled to authorize the use of these titles."

43.  In this regard, Claimant said that "[a]ny Feld advertising or commercial use of the FIM's marks to indicate a world championship will improperly mislead the public about the status of a domestic supercross championship." Claimant invited FE to sign a settlement agreement to resolve the matter and reserved "all its rights, including the rights to pursue one or more causes of action against Feld under the Lanham Act or Florida's common law—including claims for unfair competition, unjust enrichment, and injury to the FIM's business reputation."

44.  About a week later, on 23 February 2022, Claimant filed the following five marks with the Swiss Federal Institute of Intellectual Property ("**Swiss IP Institute**"):

(1) FIM SUPERCROSS GP

(2) SUPERCROSS GRAND PRIX

(3) FIM SUPERCROSS GRAND PRIX

(4) SUPERCROSS WORLD CHAMPIONSHIP

(5) FIM SUPERCROSS WORLD CHAMPIONSHIP

(together, "**Five Marks**").


COPIE CERTIFIEE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

45. On 25 February 2022, FMS responded to Claimant's third cease-and-desist letter. In that regard, FMS said that, since the termination of its Agreement in June 2021, it had been "working diligently to scrub all references to the FIM in connection with supercross", be it in its supercross video game or its promotional, marketing and merchandising materials in connection with the 2022 Monster Energy AMA Supercross season. Should Claimant nevertheless identify any unintentional remaining references to "FIM", FMS invited Claimant to let it know and promised to work in good faith to promptly remove any inadvertent uses.

46. FMS disagreed, however, that the "commonly used" and "highly descriptive"—if not "generic"—term "World" belongs exclusively to Claimant and rejected Claimant's demand that FMS refrain in the future from using the term "World" (or similar) in connection with any supercross event or title. In this regard, FMS said that there "is only one internationally renown supercross, and it is the championship series currently owned and operated by FMS and now sanctioned solely by the AMA", which "attracts the sport's best riders from around the world, and it broadcasts its races internationally." FMS accordingly considered Claimant's demand to be "inconsistent with FMS' rights to describe the AMA Supercross championship series and outside the scope of the FIM's intellectual property rights."

47. FMS also refused to transfer to Claimant the domain names "supercrossgrandprix.com", "supercrossgp.com" and "worldsupercross.com". FMS did, however, confirm that it was not using the domain name "fimsupercross.com" and would consider transferring it to Claimant upon mutually agreeable terms.

48. The following day, on 26 February 2022, Claimant filed applications with the USPTO to register in the United States the Five Marks it had filed with the Swiss IP Institute ("**Class 41 Applications**").

49. The following week, on 2 March 2022, Claimant and SX Global issued a press release unveiling their plans for the FIM supercross world championship—officially titled the "FIM World Supercross Championship" (or "**WSX**")—which they announced would take place annually in the second half of the year between June and November beginning in 2023. The year 2022 would serve as a "pilot season" with events in September through November, "allowing the series to establish itself and build momentum".

50. Following that press release, Cycle World reported that there was a "new FIM World Supercross Championship on the horizon." Cycle World said that "[m]any casual supercross fans may experience some confusion upon hearing that statement, as Monster Energy AMA Supercross has technically been the world championship of supercross, with both the AMA and FIM sanctioning the series promoted and run by Feld Entertainment." And since the expiry of the Agreement, "[m]ost fans didn't even notice the removal of FIM logos and verbiage from anything having to do with Monster Energy AMA Supercross, but technically, it's no longer the world championship." Cycle World noted, however, that "[a]s it sits, the AMA series is thought of as the de facto world championship, even without FIM sanctioning; SX Global, therefore, has basically announced its plans to change that."

51. On 1 April 2022, the AMA wrote to FE to offer its assistance to find an amicable solution to the parties' disagreements.


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

52.    Later that same month, SX Global complained to Claimant that FMS was advertising Monster Energy AMA Supercross as a "World Championship", which SX Global considered a "serious breach" of its "exclusive World Championship rights". SX Global urged Claimant to take "serious action" and its president, Tony Cochrane, said that he was "losing his patience very fast, as [were] his very substantial global partners, who have substantial lawyers." Mr Cochrane said that if this was not "sorted very quickly", it would take "major legal action and no one will like it."

53.    On 28 April 2022, Claimant wrote to Suzuki Racing to have it correct an article that erroneously described Monster Energy AMA Supercross as a "FIM World Championship".

54.    A few days later, in early May 2022, SX Global drew Claimant's attention to (1) a Bikeland article that described Monster Energy AMA Supercross as a "FIM World Supercross series", (2) a TotalMotorcyle article that called it the "Monster Energy AMA/FIM World Supercross series" and (3) a Motor Sports NewsWire article that described it as a "FIM World Championship". SX Global also noted that, while Suzuki Racing had corrected the text of its article, it had "missed the header", which still said "AMA/FIM SUPERCROSS".

55.    Towards the end of May 2022, SX Global issued a press release announcing "four of the 10 exclusive team licenses it will issue for its inaugural global championship"—one of the four going to "GSM Yamaha—Serge Guidetty". "A model unprecedented in supercross yet utilized amongst the majority of thriving sports leagues and motorsports series around the world, WSX features an exclusive team ownership structure that allows each team to increase its value over time, while also enabling a host of commercial opportunities on global and regional levels for international and local events." SX Global said that this "unique model, combined with SX Global's allocation of $50 million specifically for team and rider support over the Championship's first five years, has driven widespread interest for the coveted 10-team allotment, as evidenced by more than 40 ownership applications submitted from suitors across the globe." Under this arrangement, Mr Cochrane said that, "[f]or the first time, supercross team owners will have a true investment platform, with the ability to increase the financial value and equity of their teams over time" [internal quotation marks omitted].

56.    On 7 June 2022, SX Global filed with IP Australia to register the mark WSX WORLD SUPERCROSS CHAMPIONSHIP.

57.    Ten days later, on 17 June 2022, Claimant filed for arbitration against Respondents with the Court of Arbitration for Sport ("**CAS**") and also sought provisional measures ordering Respondents to cease using "any denominations comprising 'FIM' or 'World Championship(s)' in respect of any supercross events, titles or status organized in the United States of America, in any form and on any support, including but not limited to gaming or video."


CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

58.    About a month and a half later, on 2 August 2022, FMS and MX Sports Pro Racing ("**MX Sports**")—which promotes Lucas Oil Pro Motocross, a US-based motocross series—issued a press release announcing the formation of the "SuperMotocross World Championship"—a three-event series that would begin in 2023 and conclude in the LA Coliseum on 14 October 2023. The press release explained that this new SuperMotocross (or "**SMX**") event had been in development for more than two years and will work as follows: Monster Energy AMA Supercross (which runs between January and May) and Lucas Oil Pro Motocross (which runs between May and August) will both continue to crown their own champions at the conclusions of their respective series. Afterwards, the top 22 250cc athletes and the top 22 450cc athletes in combined supercross and motocross points from those two series will qualify to compete in the "two SuperMotocross Playoff Rounds and World Championship round for the SuperMotocross #1 plate and the sport's richest payout"—a USD 10 million purse. The SuperMotocross World Championship will thus combine both supercross and motocross to create a "unique and distinct form of racing called SuperMotocross, hence becoming a new discipline in the sport" that will be run on custom-designed tracks designed "to showcase this new style of racing."

59.    The next day, SX Global wrote to Claimant and contended that the advertising for the SuperMotocross World Championship violated its rights and Claimant's rights "to conduct 'the World Championship' for supercross." In this regard, SX Global demanded that Claimant comply with its obligations under the SX Global Contract and "immediately seek urgent relief in any relevant jurisdiction" to prevent anyone involved "from conducting, advertising, or promoting any such 'World Championship' during the term" of the SX Global Contract.

60.    Two days later, Claimant amended its request for provisional measures in this case to seek an order directing Respondents to cease using "any denominations comprising 'FIM', 'World Championship(s)' *and/or 'World Champion(s)'* in respect of any supercross, *motocross and/or any other disciplines relating to the motorcycling sport* events, titles or status organized in the United States of America, in any form and on any support, including but not limited to gaming or video."

61.    Later that same month, on 22 August 2022, Claimant filed additional applications with the USPTO to register the Five Marks ("**Class 9 Applications**"). Together, the Panel refers to Claimant's Class 41 Applications and Class 9 Applications as the "**US Applications**".

62.    The next day, Claimant issued a press release reaffirming that the "FIM World Supercross Championship remains the only supercross world championship series that is recognized and sanctioned by the FIM."

63.    The next day, the Panel rejected Claimant's request for provisional measures except to the extent that it ordered Respondents "to cease using any denominations comprising 'FIM' in respect of any supercross, motocross and/or or any other disciplines related to the motorcycling sport events, titles or status organized in the United States of America after 30 June 2021, in any form and on any support, including but not limited to gaming or video."

64.    In October 2022, Respondents filed letters of protest with the USPTO challenging Claimant's trademark applications.


COPIE CERTIFIEE CONFORME
CERTIFIED TRUE COPY

CAS 2022/O/8974 – Page 12

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

65. In mid-December 2022, the USPTO took non-binding action on all of Claimant's Class 41 Applications and all but one of Claimant's Class 9 Applications. In this regard, the USPTO found the terms SUPERCROSS GP, SUPERCROSS GRAND PRIX and SUPERCROSS WORLD CHAMPIONSHIP "merely descriptive of an ingredient, quality, characteristic, function, feature, purpose, or use of applicant's goods and/or services" and required that they be disclaimed.

66. The USPTO also refused registration of SUPERCROSS GRAND PRIX because of a likelihood of confusion with marks already registered and because the "applied-for mark merely describes a feature, characteristic, or subject matter of applicant's goods and/or services." The USPTO also refused Claimant's Class 41 Application to register SUPERCROSS WORLD CHAMPIONSHIP on the same grounds. Claimant's Class 9 Application to register SUPERCROSS WORLD CHAMPIONSHIP is the one application as to which the USPTO has yet to take action.

67. On 28 December 2022, the registration for "fimsupercross.com" expired.

### III. PROCEEDINGS BEFORE THE COURT OF ARBITRATION FOR SPORT

68. On 17 June 2022, Claimant filed its Request for Arbitration in accordance with Article R38 of the CAS Code of Sports-related Arbitration in force as from 1 July 2020 ("**CAS Code**") and enclosed a Request for Provisional Measures in accordance with Article R37 of the CAS Code. In its Request for Arbitration, Claimant nominated Mr McLin as an arbitrator in accordance with Article R40.2(3) of the CAS Code.

69. On 23 June 2022, the CAS Court Office initiated the present procedure.

70. On 15 July 2022, Respondents nominated Mr Bernasconi as an arbitrator in accordance with Article R40.2(3) of the CAS Code.

71. On 1 August 2022, Respondents filed their Answer to the Request for Provisional Measures in accordance with Article R37 of the CAS Code.

72. On 3 August 2022, the CAS Court Office informed the parties that the President of the Division had confirmed Messrs McLin and Bernasconi as arbitrators and appointed Ms Kirby as President of the Panel in accordance with Articles 40.2 and R40.3 of the CAS Code.

73. On 5 August 2022, Claimant filed a Reply to Respondents' Answer to the Request for Provisional Measures ("**Reply**").

74. On 17 August 2022, Respondents filed their Rejoinder to the Reply.

75. On 17 August 2022, Respondents also filed their Answer to the Request for Arbitration in accordance with Article R39 of the CAS Code.

76. On 24 August 2022, the Panel issued the operative part of its Order on Provisional Measures. On 8 September 2022, the Panel issued its reasoned Order on Provisional Measures.



TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

77.    On 21 October 2022, Claimant filed its Statement of Claim in accordance with Article R44.1 of the CAS Code.

78.    On 2 December 2022, Respondents filed their Response to the Statement of Claim in accordance with Article R44.1 of the CAS Code.

79.    On 5 January 2023, the parties signed an Order of Procedure in anticipation of the hearing that was foreseen for 25 January 2023.

80.    On 25 January 2023, the Panel held a hearing with the parties as planned at the CAS Court Office in Lausanne where Messrs Serge Guidetty, Todd Jendro, Guy Maitre and Ronald Sussman and Ms Molly Buck Richard were examined. In addition to these witnesses, the Panel and members of the CAS Court Office, the following people also attended the hearing: Messrs Ludovic Agassiz, Michael Bader, Charles Kimmett, Matthias Scherer, Thomas Widmer, and Mmes Laura Azaria, Juliane Hogrefe, Lisa Zeiler Joiner, Diane Melnick, Sara Moreno and Tara Vold. In addition, Mmes Elena Mégevand, Fabiola Weilenmann and Tanja Aebersold attended the hearing for educational purposes only and Mr Luca Rossi attended as a translator.

81.    At the close of the hearing, all parties confirmed that they had no objections to the way the proceedings had been conducted and agreed that the parties had been treated equally and that their rights to be heard had been respected.

82.    On 31 January 2023, the parties filed their submissions on costs.

IV.    **SUBMISSIONS OF THE PARTIES**

A.    **Claimant**

83.    Claimant's submissions on the merits of this case, in essence, may be summarized as follows:

*Factual Background*

- Claimant is the sole international body for motorcycle sports. Given its unique position, Claimant has become the trusted voice of world motorcycling and through its unrivalled outreach has established itself as the primary communication platform within this fast moving and growing sector. Partners of Claimant have the opportunity to connect with a large and diverse global audience and to share their own key messaging.

- The first world championship organized by Claimant took place in 1936 (Speedway). The first Road Racing World Championship Grand Prix—the most prestigious motorcycling competition (now MotoGP)—was launched in 1949 and the first Motocross World Championship in 1957. Since then, all world championships in motorbike racing have always been sanctioned by Claimant.

- With respect to supercross, the first international tournament organized under the aegis of Claimant took place in 1985 and was named the "Trophée Rodil". Back then, it was


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

already identified as the "World Supercross". The first races of the 1985 Trophée Rodil took place in Sweden, England and Spain and concluded with the World Supercross Finals at the LA Coliseum. Later, the Trophée Rodil was also organized in Belgium, India, Germany and Finland between 1987 and 1989. As of 1992, the Trophée Rodil officially became a world championship and was called as such. From 1992, the "Supercross World Championship" series was also organized in the Netherlands, Italy, Canada, Japan, France, Switzerland and Brazil.

- The Supercross World Championship is listed as such on Claimant's calendars and advertised as such by sponsors and the media, with Wikipedia referring to it as the "World Supercross Championship".

- A world championship organized by Claimant occupies the summit of the sports pyramid. It is a championship open to competitors of the highest level, from all over the world, that is supervised and sanctioned by impartial regulatory and disciplinary bodies. Therefore, as per Article 3 of the FIM Statutes and By-Laws ("**FIM Statutes**"), the "**official title of 'World Championships' is the exclusive property of FIM** in all disciplines of the motorcycling sport."

- Likewise, pursuant to Article 10.6 of the FIM Sporting Code, the title "Grand Prix" applied to international and/or world championships may only be used with the approval of the FIM Board of Directors.

- According to Article 11.1.2 ter (b) of the FIM Statutes, the national motorcycle federations affiliated with Claimant—including the AMA—comply and enforce compliance by their own members and license holders, with the FIM Statutes.

- World championships are governed, *inter alia*, by the FIM Statutes, FIM Sporting Code, FIM Medical Code, FIM Antidoping Code and FIM Environmental Code. Further to these, Claimant carries out a whole series of checks regarding world championships through officials such as race directors, the jury president, stewards, members of the technical commission and medical and environmental representatives with a view to ensuring the safety of the riders and fair competitions.

- The Agreement makes reference to the "Motocross World Championship", the "Motocross des Nations" and the "Supercross World Championship", with each word beginning with a capital letter because they were one of a kind. There was no other motocross world championship, motocross des nations or supercross world championship organized anywhere on the planet.

COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- Before its acquisition of Live Nation, FE sought Claimant's consent and contemplated that, following the transaction, FE and Live Nation would "continue to discuss with FIM plans for the expansion of the Supercross World Championship", obviously referring to the (only) supercross world championship then in existence—not to any supercross championship with an international reach.

- Pursuant to Clause 6 of the Agreement, the FIM rules, in particular the sporting and technical rules, shall apply to the organization of the World Championships under the Agreement. In addition, Clause 6 specifically imposes on Respondents an obligation to comply with the FIM Statutes. Consequently, Respondents had to comply with the FIM Statutes, including their Article 3 and with Article 10.7 of the FIM Sporting Code, which "states that titles such as 'FIM World' and 'Grand Prix' are for meeting provided by the FIM calendars."

- Clear Channel, Respondents' predecessor, reconfirmed its intent to perform the supercross events according to the FIM Sporting Code. And Article 6 of the 2019 Supercross Supplementary Regulations issued by Claimant jointly with the AMA and FE also "expressly indicated that the **Monster Energy AMA Supercross, a FIM World Championship is governed by** the AMA and **FIM Regulations such as the FIM Statutes, the FIM Sporting Code**, the FIM Medical Code" [internal quotation marks omitted]. More recently, in November 2019, following a letter from the Claimant's President and CEO that noted Respondents' obligation under Clause 6 of the Agreement to fulfil their contractual engagements by observing all of Claimant's codes and rules, FE manifested its intention to keep working in accordance with the FIM regulations, in particular with the FIM Anti-Doping Code.

- Pursuant to Clause 10.4 of the Agreement, on the termination of the Agreement, subject to Clause 2, all rights granted under the Agreement shall automatically revert to Claimant and Respondents shall not have any rights or obligations pursuant to the Agreement.

- Subject to certain provisions of Clause 2 that are not at issue in this case, Clause 2.11 of the Agreement reiterates that, upon the expiry of the Agreement, Respondents shall lose all the rights granted by Claimant under the Agreement, which shall automatically revert to Claimant. In particular, in case of trademark applications filed by Respondents, Respondents shall give to Claimant all titles and rights on logos and trademarks related with the World Championships that Respondents may own upon termination of the Agreement.

- Beginning in 2008, the Supercross World Championship was organized and promoted by Respondents on the basis of the Agreement, with Claimant bringing "to the then U.S. domestic series a legitimacy and a global scale."

- In November 2015, FE wrote to Claimant on behalf of FMS to complain about the fact that Claimant planned to sanction a motocross event scheduled for September 2016 in North Carolina. Respondents said that Claimant should not be sanctioning the event,


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

CAS 2022/O/8974 – Page 16

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

which was in fact a supercross event, since this would likely "lead to confusion with consumers who currently recognize the Combined Championship as the supercross series affiliated with FIM".

- From the beginning, FE has been directly involved in the performance of the Agreement, as well as in the promotion and organization of the Supercross World Championship. Mr Dave Prater, who was the manager of Monster Energy AMA Supercross, was employed by FE and communicated with Claimant with a FE email address. FE owned and operated the "supercrosslive.com" website, which has been used as the showcase website for the promotion of the Supercross World Championship organized under the Agreement. FE was also directly involved in the organization of the Supercross World Championship during the term of the Agreement by coordinating with Claimant the cancellation of the events, the attendance of FE representatives in debriefing meetings, the promotional aspect of rewarding manufacturers in the competitions, and the presence of Claimant's officials at the events. Claimant's invoices for the annual fee due under the Agreement were addressed to FE. Moreover, discussions about letters of credit issued under the Agreement took place between Claimant and FE, not FMS.

- FE's press release following the expiry of the Agreement is also telling. There, FE thanked Claimant for its years of partnership and support and presented itself as the owner of Monster Energy AMA Supercross.

- After the Agreement came to an end in June 2021, Monster Energy AMA Supercross lost its status as a world championship and reverted back to a domestic series from the 2022 season onward solely under the control of the AMA.

- Respondents understood this. In declining to extend the term of the Agreement, FMS said it would "continue to focus its efforts on the domestic Supercross season". Respondents' internal communications upon termination of the Agreement also reflect their understanding that Monster Energy AMA Supercross would no longer be a world championship, and that any reference to such denominations had to be removed. Likewise in their press release concerning the end of the Agreement, Respondents announced that the AMA would "continue in its current role as the domestic sanctioning body" for Monster Energy AMA Supercross. This dovetailed with Claimant's press release at the same time, which said that Monster Energy AMA Supercross would revert "back to a domestic series from next season onward" under the control of the AMA. The specialized press likewise understood that Monster Energy AMA Supercross would not be labelled a "World Championship" anymore.

- Despite this, in the framework of the sales of the video pass for the 2022 season, Respondents kept making reference to "FIM" and riders competing for the "2022 World Title" of the AMA supercross season. When Claimant sent FE a cease-and-desist letter, FE replied that "this was inadvertent", instructed its outside marketing partner to proceed accordingly and noted that it also needed "to change the copy of 'winning a world title' in the social copy". FE also noted that all logos, specifically promoting the 2022 season, needed to just say "Championship". But Respondents continued to refer



TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

to Monster Energy AMA Supercross as a "FIM World Championship", prompting two further cease-and-desist letters from Claimant, but to no avail.

- Further, on 2 August 2022, FMS and MX Sports announced the creation of the SuperMotocross World Championship—a "new discipline combining rounds of both Supercross and Motocross." This compelled Claimant to clarify that the "Supercross World Championship remains the only supercross world championship series that is recognised by FIM."

- Lucas Oil Pro Motocross is sanctioned by AMA Pro Racing, which is owned by Daytona Motorsport Group LLC ("**DMG**"). DMG recognized in 2009 that the official titles of world championships are exclusively owned by Claimant in all disciplines of motorcycle sport and that Claimant is the only entity entitled to license or otherwise dispose of the rights in connection with the official titles of world championships.

- In addition, Respondents still own the "fimsupercross.com", "worldsupercross.com", "supercrossgrandprix.com" and "supercrossgp.com" domain names, in breach of the Agreement.

- Respondents' conduct is jeopardizing and harming the rights Claimant has licensed to SX Global. Respondents are behaving as if they still have the right to promote the Supercross World Championship, which is no longer the case.

*Jurisdiction*

- Respondents contend that CAS lacks jurisdiction over the parties' dispute because it is a trademark dispute that falls outside the scope of the arbitration clause in the Agreement. This ignores, however, that Claimant contends that by continuing to use "World", "World Title(s)", "World Champion(s)", "World Championship(s)", "Champion(s) of the World", "Championship(s) of the World", "Grand Prix" and "GP" Respondents are committing a contractual breach.

- Moreover, under Swiss law, absent an agreement providing otherwise, there is a presumption that, when entering into the arbitration agreement, the parties intended to submit their dispute as a whole to an arbitral tribunal and not to split it up in such a way that individual questions would have to be submitted to state courts for decision. As there is no dispute that there is a valid arbitration clause in the present case, there is no place for restrictive interpretation and it must be assumed that the parties desired the tribunal to have broad jurisdiction.

- The fact that Claimant's claims concern conduct on the part of Respondents that occurred after the Agreement expired is also no reason for the Panel to decline jurisdiction. According to the principle of autonomy of the arbitration clause, the validity of such a clause contained in a contract is not affected by the expiry of the main contract or its termination.



TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- Although a non-signatory, FE is also a party to the arbitration clause under Swiss law by virtue of its involvement in the performance of the Agreement. FE was aware of the arbitration clause and manifestly and voluntarily involved itself not only in the technical and administrative support of FMS's services under the Agreement but also in the promotion and marketing of the Supercross World Championship. Given FE's significant involvement in several key aspects of the Agreement's performance, for Claimant, the roles of FMS and FE were "indistinguishable" and Claimant was in good faith entitled to infer that FE was bound, alongside FMS, by the arbitration clause. In these circumstances, CAS jurisdiction over FE must be affirmed.

*Breach of Contract*

- Under Swiss law, the Panel must ascertain the true and common intention of the parties without dwelling on any inexact expressions or designations they may have used either in error or by way of disguising the true nature of the agreement. To that end, the circumstances surrounding the conclusion of the contract, the parties' conduct during the negotiation of the contract, its performance and after its execution are relevant for the subjective interpretation of a contract.

- If the parties' true and shared consensus cannot be discerned, the Panel must search for the parties' implied consensus pursuant to the "principle of trust". In this regard, the Panel should take into consideration the relevant circumstances, including the expectations of the parties to the contract and industry or trade practice, as well as the purpose of the contract.

- Under the Agreement, Claimant granted to the Promoter the right to promote and market the Supercross World Championship. To that end, the Promoter could use certain denominations—such as "FIM" and "World Championship"—for which the Promoter had to pay annual fees to Claimant. In light of this, the Agreement "qualifies as a mixed contract undoubtfully comprising licence elements."

- Respondents were fully aware that Claimant's authorization was required to use these denominations. They agreed they had to comply with Clause 6 of the Agreement and Article 3 of the FIM Statutes. Claimant was not required to give Respondents notice of the FIM Statutes because Respondents were aware of them.

- Before entering into the Agreement, Respondents had never organized, promoted or marketed the Supercross World Championship, or otherwise used this denomination (or any of the other denominations at issue in this case). Both Claimant and Respondents considered these denominations as designating a specific championship sanctioned by Claimant and not any other supercross championship. Respondents' contention that anyone can organize an event called "Supercross World Championship" with or without Claimant is an after-the-fact legal argument developed a few months ago for the first time and is incompatible with the common understanding of the parties regarding their rights and obligations under the Agreement.


CERTIFIED TRUE COPY

CAS 2022/O/8974 – Page 19

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- An objective interpretation of the Agreement would lead to the same interpretation—namely, that the Agreement, including Article 3 of the FIM Statutes, could only be understood in good faith as comprising a license granted by Claimant to the Promoter over the use of the denominations at issue here during the term of the Agreement. Such an interpretation derives from the terms of the Agreement, its purpose and the practice in the field. Indeed, any person involved in motorbike racing knows that all world championships that have been organized since 1949 have been sanctioned by Claimant and therefore carry safety, fairness and environmental guarantees.

- As is the case with all long-term contracts, the end of license contracts does not terminate all of the obligations between the parties. The licensor must cease using the licensed right and must, for instance, hand over any documents that it may have received as well as keep certain information confidential. The licensor is likewise no longer entitled to sell the remaining stock of goods manufactured under the license. Like a tenant who remains in the premises after the expiry of his lease agreement, the licensee who continues to use the licensed rights after the end of the contract commits a breach of contract.

- Here, Respondents acquired the rights under the Agreement to promote and market the Supercross World Championship, and thus to use the denominations at issue in this case to that end. Those rights expired with the Agreement and Respondents' conduct demonstrates that they know this. Respondents cannot refuse to fulfil their obligations related to the termination of the Agreement and, at the same time, claim in good faith that they are released from the Agreement.

- In addition, the AMA, one of Claimant's national federations, is bound to comply with Article 3 of the FIM Statutes. In that regard, the AMA has guaranteed towards Claimant that all the events sanctioned by the AMA will be in full compliance with Claimant's regulations and recognized that Claimant is the sole entity entitled to license the rights in connection with the official titles of world championships, (including the Supercross World Championship) and prize events. In light of this, and since Respondents' events are exclusively sanctioned by the AMA, the AMA—and consequently Respondents—are bound to abide by the AMA's regulations and obligations to Claimant.

- Despite the above, since the expiry of the Agreement, Respondents have used, and are still using, Claimant's denominations in breach of the Agreement.

- Respondents contend that the denominations at issue are descriptive (if not generic) and could not be protected as trademarks. This, however, is irrelevant because Respondents undertook under the Agreement to cease using such denominations after its expiry. Moreover, Respondents acknowledged that the Supercross World Championship designates a specific event and is therefore not descriptive. They also expressly admitted that that US consumers recognize the Combined Championship as the supercross series affiliated with Claimant, which again is evidence that the title "Supercross World Championship" is an indicator of source and therefore not descriptive.



TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- If Respondents' contention as to Claimant's intellectual property rights had to be addressed, however, it would have to be rejected.

- Pursuant to Article 122 PILA, Swiss law is applicable to the question of the distinctiveness of the denominations at issue because this issue relates to the content of the Agreement, which is subject to Swiss law.

- Under Swiss law, the "Supercross World Championship" denomination is inherently distinctive, as evidenced by the fact that Claimant's corresponding trademark application was accepted by the Swiss IP Institute. This is because that denomination designates a specific event—namely, the supercross world championship sanctioned by Claimant. Indeed, Claimant "is in a situation of monopoly regarding the organization of world Championships in motorbike racing as both the public, the media and the riders expect such a championship to be sanctioned by the sole international body for motorcycling sports, *i.e.*, FIM." Such expectation is reinforced by the recognition by all Claimant's members (116 national federations throughout the world, including the AMA in the United States) of Claimant's exclusive rights over the denomination "World Championship".

- Under Swiss law, a sign can be considered as distinctive in a situation of monopoly, or quasi-monopoly. "Its proprietor is indeed legitimated to claim rights on a sign when it *de facto* or *ex lege* enjoys an exclusivity, or quasi-exclusivity related thereto." Swiss courts have, for example, held that the "Swiss Army" mark is distinctive given that the Swiss Army is the sole body having the task of defending the peace of Switzerland, that there is no need to keep the "Swiss Army" designation free to be used by anyone and that such a use would be inappropriate and misleading. Similar decisions have been taken with respect to the "Royal Bank of Scotland" mark and the "Swiss Salines" mark.

- Claimant is the sole international body for motorcycling sports, recognized as such by both the IOC and the Global Association of International Sports Federations. More than 116 national federations, including the AMA, acknowledge that FIM has the exclusive right to sanction motorbike world championships. The fact that the term "World Championship" designates (and has always designated) FIM-sanctioned competitions is also recognized by sponsors and the specialized media. And it is very unlikely that another international motorbike federation will be founded, and recognized as such by the national federations, the IOC, the Global Association of International Sports Federations, the sponsors, the media, the public and the riders in the near future. In addition, it would be misleading and inappropriate for any other companies, especially private companies, who pursue their own financial interest, to organize a motorbike world championship and award any world titles.

- In addition, even if Claimant's denominations were not inherently distinctive, all of them have acquired such distinctiveness through use.



TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- Under Swiss law, descriptive signs can become distinctive if they have acquired a "secondary meaning"—i.e., if through use the relevant public associates them with a specific provider. A denomination acquires a secondary meaning when a "significant proportion of the recipients of the product or services concerned perceive it as a reference to a specific undertaking." It is not necessary for such undertaking to be known by name, "but the sign must be assimilated to a mark." Use of the denomination during at least ten years is usually required. Statements by professional associations are meaningful evidence when assessing whether a sign has acquired a secondary meaning. The "Champions League", for example, is now inevitably associated to the soccer competition of that name, which is organized by the UEFA and no longer perceived as a descriptive indication of any league of champions.

- Here, Claimant has sanctioned all world championships in motorcycle racing since 1949. The fact that 116 national federations—including the AMA—recognize that the use of the "World Championship" title is restricted to FIM-sanctioned events is of paramount importance in this respect. The Supercross World Championship is no exception and has manifestly acquired a secondary meaning given that it has been used, for decades, exclusively to designate events sanctioned by Claimant.

- This denomination is now closely associated with Claimant all over the world, and notably in the United States, by the public and the riders. It is perceived as referring to events sanctioned by Claimant, as opposed to any other domestic (or private) events. This is why the specialized media understood, following expiry of the Agreement, that Monster Energy AMA Supercross was no longer a world championship. Indeed, Respondents themselves admitted that US consumers recognize the Combined Championship as the supercross series affiliated with Claimant.

- The sport's perception is, therefore, that whomever is granted the title of "World Champion" has Claimant's blessing and approval and that the underlying competition was sanctioned, or co-sanctioned, by Claimant. The "World Championship" denomination has thus acquired a secondary meaning and distinctiveness. The same goes for the denominations at issue here, which are all closely linked or derive from the "World Championship" denomination.

- In the event the Panel were to consider that US law governed the issues of distinctiveness, the outcome would be no different.

- The USPTO will examine an application as it is filed. Specific elements are required for an application under the Lanham Act, including a drawing of the mark; the name, citizenship and domicile of the applicant; the goods and services at issue; and dates of use, as well as a specimen of use.

- The USPTO will not examine a claim of acquired distinctiveness unless such a claim is presented in the application and it is extremely rare that a claim of acquired distinctiveness or disclaimer of a term is made in the original application.


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- Each application is considered on its own merits. The USPTO is not bound by decisions of former examining attorneys. If registration is refused, the applicant has six months to respond and may provide factual evidence and argument to rebut that submitted by the examining attorney, or the applicant may claim an affirmative defense such as a claim of acquired distinctiveness. If the examining attorney maintains the refusal, the applicant can seek further review on appeal to the Trademark Trial and Appeal Board ("**TTAB**").

- The USPTO has treated the term "World" and, by extension, terms such as "World Championship" in a variety of ways depending on the mark and the nature of the goods or services identified in the application. The term "World" has been considered by the USPTO as inherently distinctive in many contexts. In addition, the TTAB has issued decisions finding the term "World" to be distinctive and protectable.

- In the event Claimant makes a claim of acquired distinctiveness regarding its pending US trademark applications, there are a number of ways Claimant could support its claim. Specifically, Sections 1212 and 1212.01 of the Trademark Manual of Examining Procedure ("**TMEP**") indicate that Claimant could potentially (1) file a sworn declaration of five years of substantially exclusive and continuous use of the mark, (2) rely on one or more active prior registrations on the Principal Register of the same mark or (3) submit evidence of long usage of the mark, advertising that alerts the relevant consumer as to the source-identifying nature of the mark or surveys that show the successful outcome of such educational efforts. The question of which of the above methods is most appropriate depends on the nature of the mark.

- Claimant would be permitted to use whatever evidence and arguments it deemed appropriate to demonstrate the acquired distinctiveness of denominations such as "World Championship", including its use of "World Championship" over several decades. And there is, in fact, substantial and consistent evidence that the "World Championship" denomination has become directly and closely associated with Claimant by the public and the riders and is perceived as referring to events sanctioned by Claimant.

*Breach of the Swiss Unfair Competition Act*

- Respondents' conduct also breaches the Swiss Unfair Competition Act (or "**UCA**").

- The UCA applies either pursuant to Article 122 PILA or by virtue of Article 136 PILA.

- Respondents act unfairly within the meaning of the UCA for three main reasons. First, under Article 3(1)(d) UCA, "anyone who takes measures which are likely **to give rise to confusion** with the services or business of others acts unfairly." A person may cause confusion by using signs that are identical or similar to those of others such that the relevant public cannot distinguish the signs (direct confusion). A person can also create confusion by leading the relevant public to believe that there are legal or economic connections between both the person and others (indirect confusion). The admission of a likelihood of confusion does not presuppose the occurrence of concrete cases of


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

confusion. A risk is enough, meaning that the aggrieved party does not have to prove that confusion has actually occurred.

- Where the public is led to confuse denominations, even a high-cost advertising campaign will in principle no longer make it possible to repair the damage that has been done. Prejudice may also arise where the public is led to believe that the aggrieved party has no protection for the rights in dispute or does not any longer. Not only does this harm the aggrieved party's reputation and credibility, but this confusion is also likely to arouse emulation among competitors who think they can use the rights at stake with impunity.

- In the case at hand, Respondents' use of Claimant's denominations in respect of motorbike racing organized on US soil creates a risk of confusion for the public, the riders and the media, which are led to believe (erroneously) that Monster Energy AMA Supercross is still part of the FIM circuit (direct confusion) or, at least, co-sanctioned by both Claimant and the AMA (indirect confusion). Claimant has issued press releases to try to dispel the misunderstanding created by the Respondents' conduct, but has not been successful because a large portion of the public does not read the Claimant's press releases and even a high-cost advertising campaign is generally insufficient to repair the damage.

- Second, Respondents' conduct breaches Articles 3(1)(b) and (c) UCA. Pursuant to these Articles, "anyone who (let. b) gives **inaccurate or misleading information** about inter alia his company, his services, or his business or who, by such allegations, benefits third parties compared to their competitors or who (let. c) **bears or uses inaccurate titles** or professional designations, which are likely to imply particular distinctions or capacities, acts unfairly." Sport titles relating to competitions such as "World Champion" qualify as "titles" within the meaning of Article 3(1)(c) of the UCA.

- By using the term "World Championship" in connection with their events, Respondents give inaccurate or misleading information in violation of Article 3(1)(b) since they are merely domestic championships that are not sanctioned by Claimant. Unlike Claimant, Respondents are private companies that pursue their own financial interest instead of those of the motorcycling community. They lack any legitimacy to organize any world championships or award any world titles.

- Respondents assert that these denominations correspond to reality because the winners of Monster Energy AMA Supercross are really the best in the world and, in fact, the world's champion. This thesis, however, lacks any sense of nuance as it makes no distinction between a factual statement such as "the best supercross runner in the world", on the one hand, and the "Supercross World Champion" title, on the other. The first is a "mere subjective affirmation" whereas the second entails an official recognition, which originates from a world governing body. There cannot be two "Supercross World Champions" at the same time in the same category. Furthermore, a "World Championship" creates certain legitimate expectations on the part of the riders and the

COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

CAS 2022/O/8974 – Page 24

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

public regarding safety, fairness and environmental standards, which are not necessarily respected by private companies, such as Respondents.

- Third, Respondents' conduct breaches Article 3(1)(e) of the UCA, which provides that "anyone **who compares, in an inaccurate or misleading way**, his person or his services with those of a competitor or which, by such comparisons, advantage third parties over their competitors acts unfairly." By way of example, the "reference to the identification and advertising power of an older mark is considered unfair regardless of actual confusion if a newer service is presented as a 'substitute' of another or being 'as good as' another service."

- Respondents' use of Claimant's denominations conveys the message that Monster Energy AMA Supercross is a substitute for or equivalent to WSX, which is erroneous. While WSX offers various guarantees (such as being a safe, fair and environmentally-friendly competition), in addition to international recognition, based on rules that all the major national federations (including the AMA) adhere to, Monster Energy AMA Supercross offers nothing of the kind. It is merely an event organized by private companies. In this regard, it should be underlined that none of the riders that has participated in Monster Energy AMA Supercross has apparently gone through any anti-doping control by a World Anti-Doping Agency accredited laboratory or entity. In light of this, it seems that Respondents have failed to guarantee a clean and fair-playing field for motorcycling sport.

*Relief Sought*

- In its Request for Arbitration, Claimant sought an award:

  (1)     declaring that Respondents breached the Agreement.

  (2)     ordering Respondents to jointly pay Claimant no less than CHF 678 375 plus interest at the rate of 5% per year running from 1 January 2022 until full and final payment.

  (3)     Ordering Respondents to cease using any denominations comprising "FIM", "World Championship(s)", "World", "International", "Grand Prix" and/or "GP" in respect of supercross events, titles or status organized in the United States, in any form and on any support, including but not limited to gaming or video.

  (4)     Ordering Respondents to transfer to Claimant all the ownership rights over the trademarks, domain names and names they registered in relation with the Supercross World Championship, including but not limited to the "fimsupercross.com", "worldsupercross.com", "supercrossgrandprix.com" and "supercrossgp.com" domain names.



TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

(5)     Ordering Respondents to jointly pay a judicial penalty of CHF 10 000 per day in case of non-compliance with any of the prayers set out above in items (3) and (4).

In any event—

(6)     Ordering Respondents jointly to bear all the administrative costs and legal fees incurred by Claimant in this arbitration on a full-indemnity basis plus interest at the rate of 5% per year running from the date of the notification of the award (included) until full and final payment.

(7)     Ordering Respondents jointly to reimburse all costs and legal fees incurred in connection with these proceedings by Claimant on a full-indemnity basis plus interest at the rate of 5% per year running from the date of the notification of the award (included) until full and final payment.

- In its Statement of Claim, Claimant amended its requests for relief to seek an award:

(1)     declaring that Respondents breached the Agreement.

(2)     ordering Respondents to jointly and severally pay Claimant CHF 678 375 per year, *pro rata temporis*, from 1 July 2021 until they completely and definitely cease using the denominations mentioned under item (3), plus interest at the rate of 5% per year running from 1 July 2021 until full and final payment.

(3)     Ordering Respondents jointly and severally to cease using any denominations comprising "FIM" and/or "World Championship(s)" and/or "Championship(s) of the World" and/or "World Champion(s)" and/or "Champion(s) of the World" and/or "World Title(s)" and/or "World" and/or "Grand Prix" and/or "GP" in respect of supercross, motocross or any other disciplines related to motorcycling sports events, titles or status organized in the United States, in any form and on any support, including but not limited to gaming or video.

(4)     Ordering Respondents jointly and severally to transfer to Claimant all the ownership rights over the trademarks, domain names and names they registered in relation with the Supercross World Championship, including but not limited to the "fimsupercross.com", "worldsupercross.com", "supercrossgrandprix.com" and "supercrossgp.com" domain names.

In any event—

(5)     Ordering Respondents jointly and severally to bear all costs and legal fees incurred by Claimant in this arbitration on a full-indemnity basis plus interest at the rate of 5% per year running from the date of the notification of the award (included) until full and final payment.


COPIE CERTIFIEE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

    (6)    Ordering Respondents jointly and severally to reimburse all costs and legal fees incurred in connection with these proceedings by Claimant on a full-indemnity basis plus interest at the rate of 5% per year running from the date of the notification of the award (included) until full and final payment.

- At the hearing, Claimant further amended its requests for relief to seek an award:

    (1)    declaring that Respondents breached the Agreement.

    (2)    ordering Respondents to jointly and severally pay Claimant CHF 678 375 per year, *pro rata temporis*, from 1 July 2021 until they completely and definitely cease using the denominations mentioned under item (3), plus interest at the rate of 5% per year running from 1 July 2021 until full and final payment.

    (3)    Ordering Respondents jointly and severally not to use any denominations comprising "FIM" and/or "World Championship(s)" and/or "Championship(s) of the World" and/or "World Champion(s)" and/or "Champion(s) of the World" and/or "World Title(s)" and/or "World" and/or "Grand Prix" and/or "GP" in respect of supercross, motocross or any other disciplines related to the motorcycling sports events, titles or status organized in the United States, in any form and on any support, including but not limited to gaming or video, and to cease using all of the above and in particular the following:

    (a)



    (b)



    (c)    www.supermotocross.com

COPIE CERTIFIEE CONFORME
CERTIFIED TRUE COPY

CAS 2022/O/8974 – Page 27

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

(d)



(e)



(f)     www.supercrossgrandprix.com

(g)     www.supercrossgp.com

(4)     Ordering Respondents jointly and severally to transfer to Claimant all the ownership rights over the trademarks, domain names and names they registered in relation with the Supercross World Championship, including but not limited to the "fimsupercross.com", "worldsupercross.com", "supercrossgrandprix.com" and "supercrossgp.com" domain names.

In any event—

(5)     Ordering Respondents jointly and severally to bear all costs and legal fees incurred by Claimant in this arbitration on a full-indemnity basis plus interest at the rate of 5% per year running from the date of the notification of the award (included) until full and final payment.


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

     (6)    Ordering Respondents jointly and severally to reimburse all costs and legal fees incurred in connection with these proceedings by Claimant on a full-indemnity basis plus interest at the rate of 5% per year running from the date of the notification of the award (included) until full and final payment.[2]

**B.**    **Respondents**

84.    Respondents' submissions on the merits of this case, in essence, may be summarized as follows:

*Factual Background*

- Respondents contest all of Claimant's allegations except to the extent they concur with Respondents' own statement of facts and law or contain concessions in favor of Respondents.

- The history of motorcycle racing and Claimant and its foundation and organization are not relevant to this dispute.

- Supercross was invented in the United States, with its inaugural event held in the LA Coliseum in 1972 with international racers participating since that time. In 1974, it became an organized series with the AMA. At that time, there were several regional promoters within the industry that were ultimately acquired by Pace Motor Sports ("**Pace**"). Pace consolidated the various supercross events under a single ownership and, by 2001, the fifteen supercross races had been combined into a single series. Pace was sold to several owners before it was purchased in 2008 by the entity that became FMS. FMS has owned and operated that supercross series—now known as Monster Energy AMA Supercross—since then.

- Monster Energy AMA Supercross is the premier supercross motorcycle racing series, and it features competitors from countries around the world. Until 2001, the series was sanctioned solely by the AMA. At that time, however, AMA threatened to stop sanctioning the series, and Claimant provided a viable sanctioning alternative. Before that time, Claimant did not have any sustained presence or significance for supercross races in the United States. Ultimately, however, the AMA continued to sanction the series, with it becoming a Combined Championship—co-sanctioned by both Claimant and the AMA—in 2008 under the official title "Monster Energy AMA Supercross, an FIM World Championship" until the Agreement ended in 2021. During that period, the series operated almost exclusively in the United States as a "FIM World Championship".

---

[2] For avoidance of doubt, the Panel notes that it sought Respondents' comments on Claimant's proposal to amend its prayers for relief at the hearing. Respondents made no objection and the Panel considers that Claimant's amended prayers for relief fall within the scope of the prayers for relief in its Statement of Claim in any event.


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- The Agreement provided for promotional and sanctioning rights. FMS had rights relating to the audiovisual, marketing, promotion and commercial rights for the FIM World Championship and paid Claimant fees mainly for sanctioning the races.

- Nothing in the Agreement recognized Claimant's rights to "world championship", "world", "international", "grand prix" and "GP" or purported to grant such rights to FMS (and FMS does not use the title "grand prix" in any event).

- The use of upper and lower case letters in "Motocross World Championship", "Motocross des Nations" and "Supercross World Championship" in the Agreement is immaterial and has no effect on the protection of these terms in the present case.

- The Agreement made reference to only two marks, both of which were expressly branded with "FIM"—namely, FIM SUPERCROSS WORLD CHAMPIONSHIP and FIM MOTOCROSS WORLD CHAMPIONSHIP. These two marks were registered in Switzerland in December 1998 and expired in 2008 and 2018, respectively. FMS did not apply for any new trademark rights in Switzerland or elsewhere on behalf of Claimant during the term of the Agreement.

- Claimant filed trademark applications with the USPTO for both of these marks that were pending at the time of the Agreement. In those applications, Claimant disclaimed any exclusive right to the terms SUPERCROSS WORLD CHAMPIONSHIP and MOTOCROSS WORLD CHAMPIONSHIP. Claimant's disclaimers before the USPTO are an admission that it neither had, nor claimed to have, the exclusive rights to the "Supercross World Championship" and "Motocross World Championship" portions of the marks at that time, which coincided with the formulation and finalization of the Agreement at issue now. In addition, Claimant's applications for those marks were abandoned on 30 May 2002 and those marks were never registered in the United States.

- During the two decades from 2001 through 2021 that the Agreement was in effect, Claimant made no attempt to secure exclusive rights in the United States to the term "World Championship" or the other denominations at issue. Claimant's recent applications to the USPTO were all filed after the Agreement expired. Notably, these applications did not include an application for exclusive use of the unprotectable standalone term "World Championship". Moreover, Claimant has presented no evidence that the term "World Championship"—as opposed to "FIM World Championship"—was ever used as an official title for any of the supercross events promoted by FMS during the term of the Agreement.

- Moreover, Claimant's new promoter—SX Global—has filed in Australia to register the mark WSX WORLD SUPERCROSS CHAMPIONSHIP. SX Global's application for this mark, which includes WORLD SUPERCROSS CHAMPIONSHIP, is at odds with the position Claimant takes in this arbitration; namely that Claimant—and Claimant alone—possesses the exclusive right to use the terms "World" and "World Championship" in connection with all supercross events.


COPIE CERTIFIEE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- After the expiration of the Agreement, FMS took steps to remove all references to FIM. Despite FMS's efforts, Claimant discovered certain isolated examples in which FMS had inadvertently failed to remove "FIM" from promotional materials, which FMS acted immediately to cure. FMS acted reasonably and in good faith. Notably, Claimant presents no evidence of harm arising from these isolated instances, all of which were resolved in January 2022 before Claimant and SX Global announced in March 2022 that a pilot season of their championship would be held in September 2022. Respondents have no interest in continuing to use Claimant's name and have removed any identified unintended use of "FIM" from promotional materials. Thus, even if there were an existing agreement to arbitrate to which Respondents were currently subject (and there is not), there are no claims that arise out of or that are based on the Agreement to be adjudicated.

- Nobody controls the media and Respondents cannot be held liable for anything the media does independently. It is Claimant's obligation (not Respondents') to monitor the media's use of "FIM" post-Agreement.

- Claimant's allegations that, after the expiration of the Agreement, Respondents recognized that Monster Energy AMA Supercross lost its status as a world championship is incorrect. Respondents have never acknowledged that any former reference to "World Championship" or "World Title" had to be removed because Claimant does not have any exclusive rights regarding these (generic) terms. And the press articles on which Claimant relies are irrelevant as none of the authors of these articles had any knowledge of the terms of the Agreement.

- Claimant is a voluntary organization that people or entities may choose to join or not. Claimant has no authority to compel membership, mandate industry requirements, or otherwise restrain the ability of others to compete with it in the sport of supercross. It holds no legal authority over the sport and is not the gatekeeper for legitimacy in supercross sporting events, as underscored by the fact that supercross originated as an American sport and has operated for fifty years in the United States with international participation. During the term of the Agreement, the AMA was a member of Claimant but Respondents were not.

- Where an event is held does not determine whether it is a world championship. The world triathlon championship, for example, is always held in the US in Hawaii. Similarly, during the term of the Agreement, Monster Energy AMA Supercross operated almost exclusively in the United States, but was a "FIM World Championship". Respondents do not contest that Monster Energy AMA Supercross is domestic, in the sense that the races are operated by a US company in the United States, but this does not preclude it from rising to the level of a world championship or the winner from being a world champion. To the extent Claimant no longer considers Monster Energy AMA Supercross a world championship because it takes place in the United States, this is an artifice of how Claimant apparently ranks its own federation members. As Respondents are not members of Claimant, this is irrelevant to them.


COPIE CERTIFIEE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- Several world championship titles can and sometimes do exist within the same sport (e.g., boxing, cheese making and ice hockey). Whether or not an event is a world championship is determined by the reputation and credibility of the organizer and the actual level of the athletes, not by branding it with Claimant's name. As Monster Energy AMA Supercross features the best riders in the world and attracts the largest audience, it is absolutely accurate to consider it a world championship. Post-Claimant, Monster Energy AMA Supercross is still the most competitive and highest-profile off-road motorcycle racing championship on the planet. It sits at the top of the supercross sporting pyramid and is the largest and most prestigious supercross series in the world. In these circumstances, it would be an enormous disappointment for the riders and downright preposterous if the winners of the best supercross series in the world were not allowed to call themselves world champions at the end of the season.

- Claimant's sanctioning is irrelevant to the success of Monster Energy AMA Supercross. After the Agreement expired—and Monster Energy AMA Supercross was no longer a "FIM World Championship"—TV viewership, international subscribers and streamed viewership all went up substantially, while the estimated value of "unpaid media advertising exposure" rose from 3.1 billion "Total impressions (Domestic & International)" in 2021 (with Claimant) to 11.3 billion in 2022 (without Claimant).

- There is also no substantive difference between the FIM and AMA rules that Monster Energy AMA Supercross operated under before and after Claimant departed. It should also be noted that Claimant did not attend Monster Energy AMA Supercross races during most of the last two seasons under the Agreement.

- Professional motorcycle racing can and does operate without Claimant. The series that is now Monster Energy AMA Supercross operated without Claimant until 2001. After the Agreement expired in 2021, the series operated without Claimant during its 2022 season and will continue to do so. The series consists of two professional racing classes: the 450 and the 250. During the Agreement, Claimant only sanctioned the 450 racing class but never the 250 class.

- Self-sanctioning is also possible and can be done without the involvement of any motorcycle federation such Claimant or the AMA. For example, FMS sanctioned its own supercross race using Formula USA. This occurred for the Rockstar Energy US Open of Supercross events held in 2000 and 2001 at the MGM Grand in Las Vegas. Self-sanctioning requires a rulebook and officiating personnel and equipment to ensure the integrity of the race. FMS prefers to out-source that service, but if FMS ever needed to self-sanction supercross, it would be free to do so. DMG is another example of a professional motorcycle racing sanctioning body that is independent of Claimant. DMG sanctions Lucas Oil Pro Motocross.

- Respondents have always held the position that they or others are free to use generic or highly descriptive terms such as "supercross", "world championship", "world" and "international". After the Agreement expired, Claimant attempted to expand its ownership rights beyond its name—"FIM"—to also include descriptive terms that

COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

belong to the entire motorcycle racing industry, in which there are competitors. Notably, in Claimant's three cease-and-desist letters, Claimant did not make any allegations of breach of the Agreement at all. That changed when Claimant argued for the first time in its Request for Arbitration that Respondents had breached the Agreement—an allegation that is a necessary predicate for Claimant to make any filing with the CAS and attempt to apply Swiss law to the current issue.

- FMS and Claimant had a good working relationship during the term of the Agreement. SX Global and Claimant are now direct competitors of FMS with respect to supercross. SX Global has adopted a different operating model whereby ten teams can buy a spot in its league. One of the teams that has done so is Mr Guidetty's team, GSM Yamaha. In doing so, his team has joined (and purchased a financial interest in the success of) SX Global.

*Jurisdiction*

- CAS has no jurisdiction to hear Claimant's claims, which seek to prohibit Respondents from using the denominations at issue when promoting Monster Energy AMA Supercross events held in the United States.

- First, the Agreement that included the arbitration clause expired by its terms a year before Claimant filed its Request for Arbitration with CAS and contained no language that would establish some continuing right to demand arbitration before CAS in perpetuity. On the contrary, the Agreement expressly provided that, at its conclusion, FMS would not have any obligations under it, thus eliminating any remaining obligation to arbitrate disputes before the CAS. There is accordingly no currently existing agreement to arbitrate before the CAS, and Respondents do not consent to such an arbitration.

- Second, the applicability of a valid arbitration clause extends only to the disputes concerning the contract and the settlement of the termination of the contract. The expired Agreement provided for promotional and sanctioning rights which granted FMS use, and the reversion back to FIM, of only those rights that FIM actually owned during the Agreement's term. It was not a licensing agreement. Claimant did not possess any exclusive right—let alone in the United States—to the denominations at issue before, during or after the term of the Agreement. Claimant's current claims regarding the denominations at issue were accordingly not a subject of the expired Agreement and thus not "arbitrable" pursuant to it.

- Third, there is no basis for Claimant to have CAS decide under Swiss law whether Claimant can prevent Respondents from using the denominations at issue in the United States, particularly as (1) Claimant admittedly has no rights to the exclusive use of such terms; (2) Claimant has only applied to register marks incorporating such terms after the Agreement expired; (3) none of them were used in the specific form filed during the term of the Agreement and (4) the USPTO has so far refused nine of Claimant's ten applications—including those made to register SUPERCROSS WORLD CHAMPIONSHIP and SUPERCROSS GRAND PRIX—on the grounds that they were

COPIE CERTIFIEE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

descriptive, and required disclaimer of the terms SUPERCROSS WORLD CHAMPIONSHIP, SUPERCROSS GRAND PRIX and SUPERCROSS GP. Whether Claimant has an exclusive claim to use the denominations at issue is a pure trademark law question and must be decided on that basis in the appropriate forum—either the USPTO or a US court. The parties never intended to submit all potential non-contractual disputes to CAS after the Agreement expired, which is what Claimant is attempting to do.

- Fourth, the Five Marks Claimant registered in Switzerland in 2022 were registered after the Agreement had expired and therefore cannot be a subject matter of the Agreement since those registered word trademarks did not even exist during the term of the Agreement. If FMS did ever use those marks, only a trademark infringement claim could exist that would raise extra-contractual issues, which are clearly not covered by the arbitration clause. Moreover, any protection afforded by the registration in Switzerland exists only for Switzerland and has no effect on the use of the trademark in the United States.

- Fifth, FE was not a party to the expired Agreement containing the arbitration clause nor did it ever consent to arbitration with Claimant. As a rule, an arbitration clause in an agreement is only binding on the signatories to the agreement, and the Federal Tribunal only accepts very limited exceptions to this rule, none of which are applicable in this case.

- As the parent company, FE runs various overhead functions such as legal, accounting, tax, employment, and payroll for its subsidiaries, such as FMS. FE also provides IT services to its subsidiaries (e.g., hosting websites, providing email addresses). It is common for a parent company or an affiliated company to take care of certain tasks for affiliated companies in order to save resources and bundle competencies, including the organization of events and meetings and taking care of some financial questions. Indeed, all of the people who work for FMS are actually employed by FE because FE processes the payroll and all FE employees use email addresses @feldinc.com. None of this constitutes behavior that can be regarded as an implied declaration of an intent to be bound by the Agreement and its arbitration clause.

- Payments due under the Agreement to Claimant were made by FMS (even though Claimant erroneously addressed its invoices to FE). Contrary to what Claimant alleges, FE did not issue the Supercross Supplementary Regulations jointly with Claimant and the AMA. It was FMS who confirmed through a press release that it would not renew the Agreement with Claimant. That FE thanked Claimant for its years of support cannot make FE a party to the Agreement that was about to expire. In short, FE did not substantially participate in the performance of the Agreement and never expressed an intention through its behavior (either explicit or implied) from which Claimant could interpret in good faith that FE wanted to be party to the arbitration clause in the Agreement. In these circumstances, Claimant has no basis to bring an arbitration against FE in Switzerland or anywhere else.

COPIE CERTIFIEE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- Sixth, CAS has no jurisdiction over, and Claimant has no interest in or rights to, SuperMotocross. SMX is a new discipline of professional motorcycle racing that arose out of discussions between FMS and MX Sports that occurred during COVID. SMX has no relationship to Claimant. Claimant was never a party to any conversations about, or a participant in the creation or development of SMX and has no SMX racing. SMX did not exist during the term of the Agreement and neither FMS nor MX Sports have consented to arbitrate anything related to SMX.

- Finally, insofar as the real party in interest is SX Global, which has pressured Claimant into filing this arbitration, the arbitration should not proceed because Respondents have never entered into any agreement with SX Global to arbitrate trademark issues before the CAS in Switzerland pursuant to Swiss law. Claimant's arbitration with CAS represents an improper effort to bypass the USPTO and applicable US law to obtain instead an arbitration ruling under Swiss law to somehow grant Claimant exclusive rights to use the denominations at issue in the United States.

*Breach of Contract*

- Further to the principle *nemo plus iuris transferre potest quam ipse habet*—no one can transfer more rights than he has himself—Claimant could not have transferred any rights to the denominations at issue or prohibited their use because they do not belong exclusively to Claimant. And the Agreement nowhere purports to grant FMS rights to them.

- The Agreement is not a license agreement because Claimant did not grant FMS the use and exploitation of intellectual property rights which have been conceived by the legislator as absolute rights with *erga omnes* effect. In the present case, no intellectual property rights were made available, as no such rights exist in the United States and it is unlikely they ever will.

- There is no reference to any license in the Agreement. The text of the Agreement demonstrates that it is an agreement for promotional and sanctioning rights. Claimant only contends that the Agreement is a licensing agreement because it considers this would be favorable to its position.

- Even if licensing aspects were included in the Agreement, it would only concern "FIM Motocross World Championship" and "FIM Supercross World Championship"—the completely generic term "World Championship" has never been addressed and Claimant could not have transferred rights to that denomination because it had none. In addition, Claimant has presented no evidence that the public associates the denomination "World Championship" exclusively with Claimant.

- The domain names "supercrossgrandprix.com", "supercrossgp.com" and "worldsupercross.com" all contain generic terms. There is no connection between those domains and the Agreement and Claimant has no right to them. Respondents have no contractual obligation to transfer them to Claimant and no contractual breach exists.


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

CAS 2022/O/8974 – Page 35

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- FMS offered to transfer the domain name "fimsupercross.com" to Claimant but Claimant never responded and that domain has now expired. Claimant can accordingly arrange for itself to operate a website under that domain if it wishes.

- Under Clause 2 of the Agreement, Claimant granted to FMS the exclusive worldwide use of two marks, which were registered by Claimant in Switzerland in 1998 and expired in 2008 and 2018. As Claimant alleges that Respondents breached the Agreement after it expired in June 2021, these two marks are irrelevant to the parties' dispute. Moreover, nothing in the Swiss Trademark Register shows any transfer of rights to Respondents, so there is no formal trademark transfer under Swiss law. And FMS never made any applications for trademark rights on Claimant's behalf during the term of the Agreement, as it was in principle entitled to do under Clause 2.6.

- It is incomprehensible what significance the use of upper as opposed to lower case letters in the Agreement is supposed to make, as the fact that words are written in lower or upper case has no influence on the protection of the words in the present case.

- FMS was never bound by FIM's Statutes because it was never a member of Claimant.

- Nothing in Clause 6 of the Agreement indicates that FIM's Statutes were incorporated into the Agreement. Under Swiss law, such incorporation by reference requires notice, which FMS never received. Moreover, as Claimant never sent FMS a copy of the FIM Statutes, under the terms of the Agreement, Claimant may not rely on them.

- Even if FMS had been bound by FIM's Statutes—which it was not—it is no longer bound by virtue of the expiry of the Agreement.

- Article 3 of FIM's Statutes is only a unilateral statement on the part of Claimant without any effect in the context of the Agreement.

- There is no evidence that "World Championship" as opposed to "FIM World Championship" has even been used as an official title for any events promoted by FMS during the term of the Agreement.

- FIM's Statutes are only relevant to the AMA, which was not a party to the Agreement. Claimant's reliance on them is accordingly misplaced.

- FIM's Sporting Code refers to "FIM World Championships", not "World Championships" generally.

- Further to Clause 10.4 of the Agreement, upon termination, the rights under Clause 2 of the Agreement automatically reverted to Claimant and FMS had no further rights or obligations under the Agreement. There is no clause that would bind FMS beyond the term of the Agreement and FMS accordingly has no more obligations under the Agreement. Respondents are not behaving as if the Agreement did not expire on 30 June 2021 and Claimant has presented no evidence that they are.

COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- Neither DMG nor AMA Pro Racing (an entity owned and operated by DMG that is not the AMA and not a member of Claimant) has ever agreed that Claimant has exclusive rights to the title "World Championship" in all things related to motorcycle sports. No reading of the document upon which Claimant relies can support such a proposition and the document expressly states that it is "not legally binding" in any event.

- Claimant does not have the unilateral right to decide whether it can hold the only world championship. It has no authority to compel membership, mandate industry requirements or otherwise restrain the ability of others to compete with it. Claimant is not state-sanctioned and holds no legal authority over the sport of supercross. It cannot offer any authority (apart from its own opinion) recognizing it as the sole entity authorized to sanction supercross world championship events.

- Claimant is not comparable to the Swiss Army (the armed force of Switzerland and a pan-federal institution), the Royal Bank of Scotland (the only bank in Scotland with a connection to the royal family) or the Swiss Salines (whose shareholders are all the cantons in Switzerland and the Principality of Lichtenstein)—all of which are state-sanctioned monopolies. Claimant is a private association that grossly overstates its importance and has no ability to restrain others from competing with it. Claimant is not state sanctioned and holds no legal authority over the sport.

- None of Claimant's cease-and-desist letters alleged breach of the Agreement, which Claimant has asserted here in an effort to invoke the jurisdiction of CAS.

- Claimant's claim is, in fact, a claim for infringement of intellectual property.

- Under Swiss law, intellectual property rights are governed by the law of the state for which protection of intellectual property rights is sought. Here, Claimant contends that Respondents should be ordered to cease using the denominations at issue in the United States, so US law applies.

- In the United States, protectable rights in a mark can be recognized in two ways: by the USPTO through the issuance of a registration or (2) by order of a US court.

- At present, Claimant has no rights to the Five Marks in the United States. Claimant effectively acknowledged this by filing trademark applications for the Five Marks with the USPTO.

- And the USPTO has now taken non-binding action on nine of Claimant's ten US Applications—(1) finding SUPERCROSS GP, SUPERCROSS GRAND PRIX and SUPERCROSS WORLD CHAMPIONSHIP "merely descriptive of an ingredient, quality, characteristic, function, feature, purpose, or use of applicant's goods and/or services" and requiring that they be disclaimed and (2) refusing registration of SUPERCROSS GRAND PRIX and SUPERCROSS WORLD CHAMPIONSHIP because of a likelihood of confusion with marks already registered and because the "applied-for mark merely describes a feature, characteristic, or subject matter of applicant's goods and/or services."



TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- Claimant contends that it may be able to get protection in the US for the Five Marks by establishing that they have acquired distinctiveness. Under US law, whether an applicant has shown acquired distinctiveness necessary to overcome a descriptiveness refusal or disclaimer requirement is a question of fact. Three basic types of evidence may be used to establish acquired distinctiveness: (1) prior registrations, (2) five years of continuous and substantially exclusive use and (3) other appropriate evidence (e.g., consumer survey evidence). The quantum of evidence required to establish acquired distinctiveness varies depending on how descriptive the mark is, with more descriptive marks requiring more evidence.

- Claimant, however, has not submitted any evidence to the USPTO (or to the Panel) to establish acquired distinctiveness for any of the Five Marks. Nor is it likely that it would be able to do so given:

  (1)   Claimant's previous failed attempts at the USPTO to obtain exclusive protection for marks that included the term "world championship".

  (2)   Claimant's having previously disclaimed the term "world championship" in prior applications to the USPTO.

  (3)   The USPTO's well-established recognition of the descriptive nature of terms like "world" in the TMEP.

  (4)   The USPTO's treatment of the term "world" as descriptive—and the terms "supercross" and "championship" as generic—in connection with supercross competition event services.

  (5)   Claimant's lack of any meaningful history of independent use of the terms "world championship" or "supercross world championship".

  (6)   The significant evidentiary burden Claimant would have to meet given that the term "world championship" is highly descriptive.

  (7)   Respondents' willingness to challenge before the TTAB any finding of acquired distinctiveness the USPTO might make.

- Moreover, SX Global—Claimant's new promoter—has filed in Australia to register the mark WSX WORLD SUPERCROSS CHAMPIONSHIP. This is at odds with Claimant's position that it possesses the exclusive right to use the terms "World" and "World Championship" in connection with supercross events. If this were so, then it should be Claimant—not SX Global—applying to register WSX WORLD SUPERCROSS CHAMPIONSHIP in Australia. This and Claimant's conduct before the USPTO cannot be squared with its claims in these proceedings.

COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- It should also be noted that, if Claimant truly felt that it had any protectable trademark rights in the United States, it could have filed a trademark infringement action in the US courts seeking preliminary injunctive relief against FMS. It also could have sought to expedite the determination of its applications before the USPTO. That it did neither of these things evinces a deliberate effort on Claimant's part to evade the exacting demands required under US law to assert exclusive trademark protection for highly descriptive terms by shopping its claims to this forum instead.

- Any intellectual property protection Claimant has by virtue of the Five Marks it registered in Switzerland after the expiry of the Agreement only applies in Switzerland and has no effect on the use of those marks in the United States, which is what is at issue here.

- In all events, however, Claimant has not presented evidence that could support a finding under Swiss law that the "Supercross World Championship" has secondary meaning. Claimant contends that the public associates "Supercross World Championship" with Claimant in the same way the public associates the "Champions League" with the soccer competition organized by the UEFA. But Claimant has presented no evidence establishing that the relevant public associates "Supercross World Championship" with Claimant. Nor could it because the public, riders and media do not associate the "Supercross World Championship" with Claimant. They associate it with Monster Energy AMA Supercross, which attracts the sport's best riders from around the world and broadcasts its races internationally.

- Claimant has not explained why it demands damages of CHF 678 375 or how this amount was calculated, nor did it explain on what legal grounds such a claim would be based. It is accordingly completely unjustified.

*Swiss Unfair Competition Act*

- It is not clear why Respondents—both US companies operating in the United States—would be subject to the UCA at all.

- In all events, claims based on the UCA are governed by the law of the state in whose market the result occurred. In this case, that would be US law, not Swiss law.

- It appears that Claimant's claim under the UCA depends on Claimant having rights to the terms "World Championship" and "World Champion"—either by virtue of the Agreement or trademark law—which it does not have.

- In the event the Panel were to conclude that the UCA applies in the circumstances of this case, there is no evidence that Respondents' conduct qualifies as breach of the UCA.

COPIE CERTIFIEE CONFORME
CERTIFIED TRUE COPY

CAS 2022/O/8974 – Page 39

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- Specifically, Claimant has produced no evidence that there is a risk of confusion for the public, the riders or the media because they might be led to believe that Monster Energy AMA Supercross is still a part of the FIM circuit and co-sanctioned by Claimant—much less any evidence that the alleged confusion was caused by Respondents. Moreover, if Claimant actually has this concern, it makes no sense that Claimant continues to publicize Monster Energy AMA Supercross on its own website.

- The racers and the audience of Monster Energy AMA Supercross are fully aware that FMS did not renew the Agreement since both FMS and Claimant issued press releases announcing the end of their collaboration. The logos were systematically changed on all relevant platforms and the references to "FIM" were removed. Respondents do not mention Claimant in any of their advertisements. The rulebook for the 2022 season was adapted by FMS and the AMA and no one claims that Monster Energy AMA Supercross is sanctioned by Claimant. While it appears that scattered media outlets and Suzuki Racing initially posted content that associated Claimant with Monster Energy AMA Supercross, this appears more likely to be evidence of their failure to timely update their graphics packages and boilerplate text than confusion. In short, a reference to any potential risk of confusion is nowhere apparent or established that could serve as a basis for finding a breach of the UCA.

- To the extent Claimant contends that its efforts have failed to dispel any confusion, this has not been established because (1) there is no proof that any confusion existed in the first place and (2) there is no evidence that any alleged confusion is ongoing despite Claimant's efforts.

- Indeed, Claimant's allegations of confusion sit awkwardly with its other contentions in these proceedings. With respect to intellectual property issues, Claimant takes the position that the relevant public knows it and that it therefore has a high-recognition value. But with respect to its claim under the UCA it contends that the public is confused and believes that Monster Energy AMA Supercross is related to Claimant.

- That others may believe that Claimant does not own the rights to "World Championship" and "World Champion" could only potentially cause harm to Claimant if it does in fact own those rights, which Claimant has not proven it does.

- Claimant can run its own supercross series and "officially recognize" whomever it likes as its winner. There is no evidence that there will be any confusion between WSX and Monster Energy AMA Supercross. The experts and the media will eventually decide whether the denomination "World Champion" is indeed justified, based on criteria such as the reputation and credibility of the organizers and the level of the participants. Since Monster Energy AMA Supercross features the best riders in the world and attracts the largest audience, it is justifiably perceived as a true world championship.

COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

- Claimant does not explain why there cannot be two world championships at the same time, as there are in other sports. In boxing, there are four recognized world championship titles. Indeed, there are even more, but they are not recognized by the experts because of their lack of importance. But that does not prohibit them from existing. The decisive factor is the reputation and credibility of the individual boxing organization and the actual level of the athletes.

- It is not sports titles for tournaments that are covered by the UCA but rather the titles that a sportsman gives himself. A person may not call himself "Cup Winner" or "World Champion" if he has not won such a title. However, the fact that a company can hold championships itself has nothing to do with this. If FMS awards a title, the winners may also name themselves with the title they win.

- Claimant's insistence that Monster Energy AMA Supercross is "domestic" is opportunistic for the reasons explained above.

- Claimant's arguments in support of its UCA claim are anti-competitive and an effort to restrain free markets.

- Respondents are not members of Claimant and therefore are not obliged to adopt its rules. The AMA, which sanctions Monster Energy AMA Supercross, also has regulations regarding safety, fairness, and environmental standards, including regulations regarding equipment standards, fuel test procedures and anti-doping. At the request of riders, the anti-doping program for Monster Energy AMA Supercross has been aligned with that for Lucas Oil Pro Motocross, which FMS supports.

- Claimant has not explained why it demands damages of CHF 678 375 or how this amount was calculated, nor did it explain on what legal grounds such a claim would be based. It is accordingly completely unjustified.

- In view of the above, Respondents seek an award:

  (1)   Determining that CAS has no jurisdiction to hear the present case.

  (2)   Alternatively, determining that Claimant's claims be entirely dismissed.

  (3)   Ordering Claimant to pay the arbitration costs of the proceedings regarding provisional measures as well as of these proceedings and all costs of Respondents incurred in connection with the proceedings regarding provisional measures and these proceedings (including VAT, if applicable).

COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

### V.    JURISDICTION

85.    Under Article R39 of the CAS Code, the Panel has the power to rule on its own jurisdiction.

86.    Claimant has brought this arbitration pursuant to Clause 14 of the Agreement, which provides as follows:

> *14.    APPLICABLE LAWS AND ARBITRATION*
>
> *This Agreement shall be subject to Swiss law.*
>
> *Any dispute arising from or related to the present contract will be submitted exclusively to the Court of Arbitration for Sport in Lausanne, Switzerland and resolved definitively in accordance with the Code of Sports related Arbitration, the panel will consist of three arbitrators. The language of arbitration will be the English language.*

87.    Chapter 12 of the Private International Law Act ("**PILA**") applies to this arbitration by virtue of the fact that the seat of the arbitral tribunal is in Switzerland and, at the time of the conclusion of the Agreement containing the arbitration clause, at least one of the parties had neither its domicile nor its habitual residence in Switzerland (Art. 176(1) PILA).

88.    Under Article 178(2) PILA, an arbitration agreement is valid if it conforms either to the law chosen by the parties or to the law governing the subject matter of the dispute, in particular the main contract, or to Swiss law.

89.    Here the Agreement provides that it shall be subject to Swiss law and the parties have not agreed that the purported arbitration agreement should be subject to a different law. The Panel accordingly considers its jurisdiction under Swiss law.

90.    As detailed above, Respondents challenge CAS jurisdiction in this case. In this regard, Respondents contend that (A) the arbitration clause expired with Agreement, (B) the parties' dispute falls outside the scope of the arbitration clause in the Agreement and (C) FE is not a party to the arbitration clause contained in the Agreement. The Panel examines each of these contentions in turn below.

### A.    Expiry of the Arbitration Clause

91.    Under Swiss law, the arbitration clause is separable from the main contract in which it is contained. As a consequence, the expiry of the main contract does not in and of itself result in the expiry of the arbitration clause (Federal Tribunal, 4A_438/2013, 27 Feb. 2014, paras. 3.3.2, 3.3.3; Oetiker in *Zürcher Kommentar zum IPRG*, 3rd ed. 2018 ("*Oetiker*"), Art. 178 N 178). To the extent Respondents contend otherwise, their position is not supported by Swiss law.


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

92. Respondents rely on the language in Clause 10.4 of the Agreement to contend that the arbitration clause expired with the Agreement on the facts of this case. That Clause provides in pertinent part that "all rights under this Agreement shall automatically revert to the FIM and DOR shall not have any rights or obligations herein pursuant to said agreement." According to Respondents, in light of Clause 10.4, one should understand the parties to have agreed that they would have no right or obligation to arbitrate following expiry of the Agreement.

93. The Panel disagrees.

94. Under Swiss law, the interpretation of an arbitration clause follows the generally applicable principles of contract interpretation. In that regard, Article 18 of the Code of Obligations provides that, "[w]hen assessing the form and terms of a contract, the true and common intention of the parties must be ascertained without dwelling on any inexact expressions or designations they may have used either in error or by way of disguising the true nature of the agreement."

95. The relevant true and common intention of the parties is that which existed at the time the contract was concluded (Winiger, *Commentaire romand du Code des obligations*, 3rd ed. 2021, Art. 18, N 17).

96. Swiss doctrine on this may be summarized as follows: To establish the true intent of the parties, Swiss courts first look at the text of the contract but do not stop at a literal interpretation of the wording. Even a contractual clause that appears clear at first sight, may be the result of other conditions of the contract, the purpose pursued by the parties or other circumstances such that the wording of the clause does not accurately reflect the meaning of the agreement reached (*id.* N 16).

97. Statements made by the parties prior to the conclusion of the contract, circumstances preceding or accompanying the conclusion of the contract, draft contracts, correspondence exchanged, but also the behavior of the parties after the conclusion, may provide information about their will and intentions (*id.* N 34). Other clues to interpretation may be drawn from the customs of commerce and business (*id.* N 36). All of this should be considered in light of the contractual objective, as the purpose of the parties can provide information on their respective intentions and allow the literal meaning of the wording to be supplemented, rectified or corrected (*id.* N 37). Having said this, even though teleological interpretation can prevail over the literal meaning of the contractual wording, it gives way in case of doubt (*id.* N 39).

98. If it is not possible to establish the true and common intent of the parties, the contract must be interpreted objectively according to the "principle of mutual trust" to identify the meaning that the parties could and should give, according to the rules of good faith, to their mutual declarations of intent (Noth/Haas, Article R27 of the CAS Code in *Arbitration in Switzerland—The Practitioner's Guide*, 2018, at 1437). This objective interpretation is likewise not based solely on the wording and context of the contract, but also takes into account the surrounding circumstances, apart from circumstances that occurred subsequently (*cf.* Gränicher in *Basler Kommentar Internationales Privatrecht*, 4th ed. 2021, Art. 178 N 78).


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

CAS 2022/O/8974 – Page 43

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

99.   Here, it is not possible to determine the true intent of the parties at the time the Agreement containing the arbitration clause was concluded in 2001. This is because the Agreement was negotiated and signed by Claimant and DOR.  Respondents had no connection to the Agreement until FE's acquisition of Live Nation in September 2008. And there is no basis to determine the true intent of Claimant and DOR more than 20 years ago, particularly in the absence of any evidence from DOR in these proceedings. The Panel shall therefore interpret the Agreement and the arbitration clause it contains objectively in accordance with the principle of good faith.

100.  Given the principle of separability under Swiss law—and the fact that the expiry of the main contract does not in and of itself result in the expiry of the arbitration clause—an agreement that the arbitration clause should expire with the main contract "cannot be accepted lightly and it must be clear from the agreement" (*cf.* Federal Tribunal, 4A_438/2013, 27 Feb. 2014, para. 3.3.3).

101.  No such agreement is apparent from the terms of the Agreement or the arbitration clause. Clause 10.4 of the Agreement makes no reference to the arbitration clause. And the arbitration clause does not contain any language concerning the expiration of the Agreement, much less any suggesting that the arbitration clause would expire along with it.

102.  Moreover, Respondents' reading of Clause 10.4 would result in an odd situation where the parties' disputes "arising from or related to" the Agreement would go to arbitration during the term of the Agreement but then to state courts thereafter. The Panel is not aware of any reason why Claimant and DOR would have agreed to such a mixed dispute resolution regime— arbitration during one time period and state court litigation in another—and Respondents have not offered any basis for such an interpretation.

103.  Respondents have advanced a more subtle version of their expiry argument, however. Specifically, Respondents contend that the arbitration clause contained in a main contract that has expired only applies to disputes concerning the termination of the main contract. For this proposition, Respondents cite an authority on Article 178 PILA, which says that, "[u]nless the parties expressly provide otherwise in their termination agreement, it can usually be assumed that they want the arbitration clause to continue to apply to disputes in connection with the settlement of the termination of the contract" (*Oetiker*, Art. 178 N 178, as translated by Respondents). As Claimant's claims in these proceedings are not, in Respondents' view, disputes in connection with the settlement of the termination of the contract, they fall outside of the scope of the arbitration clause after the expiry of the Agreement.

104.  The Panel again disagrees.

105.  As a preliminary matter, the cited authority does not say that an arbitration clause contained in a main contract that has expired *only* applies to disputes in connection with the settlement of the termination of the main contract. It merely says that it would normally be reasonable to assume that it continues to apply to such disputes without addressing whether it might apply to other disputes as well.


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

106. In addition, the Panel does not read the authority's reference to "disputes in connection with the settlement of the termination of the contract" as narrowly as Respondents apparently do—namely, as disputes focused specifically on the termination of the main contract. Rather, the Panel reads it to encompass disputes concerning the parties' rights and obligations under the main contract following its expiration—precisely the type of dispute present here.

107. The Panel is also unaware of any authority under Swiss law for the proposition that the scope of an arbitration clause changes upon the expiry of the main contract in which it is contained. Presumably it could if the parties so agreed, but there is no evidence of any such agreement here.

### B.    Scope of the Arbitration Clause

108. Under Swiss law, the scope of an arbitration clause must be determined by interpretation in accordance with the principles set out above. In the circumstances of this case, for the reasons explained above, this means that the Panel must interpret the arbitration clause objectively in accordance with the principle of good faith.

109. The arbitration clause in the Agreement applies to "[a]ny dispute arising from or related to" the Agreement and therefore necessarily covers Claimant's claim for breach of the Agreement.

110. Respondents resist this conclusion on the basis that Claimant does not have a breach of contract claim under the expired Agreement. According to Respondents, the Agreement is not a license agreement and Claimant did not possess exclusive rights to the denominations at issue before, during or after the term of the Agreement. In light of this, those denominations were not a subject of the expired Agreement and thus not "arbitrable" pursuant to it.

111. The Panel disagrees.

112. As a preliminary matter, the Panel understands Respondents to be contesting CAS's jurisdiction over Claimant's contract claim, rather than contesting the arbitrability of that claim under Swiss law. However, to the extent Respondents are contesting the arbitrability of Claimant's contract claim under Swiss law, they have provided no authority for their position and the Panel is aware of none (cf. Dessemontet, Arbitration, Intellectual Property and Competition Law, Objective Arbitrability, Antitrust Disputes in *Intellectual Property Disputes*, ASA Special Series, No. 6, 1997: "Everything that is pecuniary is arbitrable").

113. On the issue of jurisdiction, there is nothing in the text of the arbitration clause at issue that limits it to disputes concerning the "subject of the expired Agreement". It rather covers all disputes "arising from or related to" the Agreement, which necessarily covers a claim for breach of the Agreement.

114. To the extent Respondents consider that Claimant can have no claim for breach of the Agreement because the Agreement is not a license agreement and Claimant never had any


CERTIFIED TRUE COPY

CAS 2022/O/8974 – Page 45

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

exclusive rights to the denominations at issue under the terms of the Agreement, that is a matter going to the merits of Claimant's claim rather to the issue of CAS jurisdiction.

115.   Respondents also contend that the issue of whether Claimant has exclusive rights in the United States to the disputed denominations at issue is a pure trademark question that must be decided before the USPTO or in the US courts. As the parties never agreed to submit to CAS all potential non-contractual disputes that arise after the Agreement expired, CAS should decline jurisdiction.

116.   The Panel again disagrees.

117.   In these proceedings, Claimant has brought a claim for breach of the Agreement. It has not brought a claim for infringement under US law or otherwise and Respondents have no power to redefine Claimant's contract claim as such.

118.   To the extent Respondents consider that Claimant's contract claim should be rejected because it is based on events that took place after the Agreement had expired, that is also a matter going to the merits of Claimant's claim, not to the issue of CAS jurisdiction.

119.   Respondents similarly note that Claimant only registered the Five Marks in Switzerland after the expiry of the Agreement and contend that they therefore cannot be a subject of the Agreement. If Respondents ever did use any of the Five Marks, they contend that Claimant could only possibly have an extra-contractual claim for trademark infringement that would not be covered by the arbitration clause.

120.   This is neither here nor there. Claimant has not brought a claim for trademark infringement under Swiss law or otherwise in these proceedings. To the extent the timing of Claimant's registration of the Five Marks in Switzerland bears on its claim for breach of the Agreement, that (again) is a matter going to the merits of the claim rather than CAS jurisdiction.

121.   Respondents also contend that CAS lacks jurisdiction because neither FMS nor MX Sports ever agreed to arbitrate anything related to SMX, with which Claimant has never had any involvement or connection. This too misses the point. The arbitration clause in the Agreement covers any dispute "arising from or related to" the Agreement, which necessarily covers Claimant's claim for breach of the Agreement.

122.   To the extent Respondents consider that there is no basis under the terms of the Agreement for an order directing FMS to cease using the denominations at issue in respect of all motorcycling events, title or status organized in the United States—including SMX—this is also a matter going to the merits of Claimant's claim rather than to CAS jurisdiction.

123.   Finally, Respondents contend that, to the extent SX Global is the real party in interest that has pressured Claimant to bring this arbitration, the case should be dismissed for lack of jurisdiction because Respondents have never entered into any agreement with SX Global to arbitrate trademark issues before CAS in Switzerland pursuant to Swiss law. Respondents have cited no authority for this proposition, however, and the Panel is aware of none. SX


CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

Global is not a party to this case and the alleged absence of an arbitration agreement between Respondents and SX Global is accordingly irrelevant.

124.  Claimant has also brought a claim for breach of the Swiss Unfair Competition Act. Specifically, Claimant contends that Respondents have breached the UCA by using "FIM" and the other denominations at issue. To the extent, this claim is based on Claimant's alleged exclusive rights under the Agreement to use "FIM" and the other denominations at issue, it is also necessarily a dispute "arising from or relating to" the Agreement and falls within the scope of the arbitration clause and CAS jurisdiction (Federal Tribunal, 4A_438/2013, 27 Feb. 2014, para. 3.3.2: finding that the parties' presumable intent in agreeing an arbitration clause covering disputes "relating to or arising out of" an agreement is to "submit to the exclusive jurisdiction of an arbitral tribunal all claims arising from the contractually regulated facts or directly concerning them") [internal quotation marks omitted].

125.  At the hearing, however, Claimant clarified that its UCA claim is "separate from the contractual basis" and does not depend on its having exclusive rights to "FIM" and the other denominations at issue under the Agreement. Claimant explained that it has a claim under the UCA based on alleged consumer confusion in the United States that arises from Respondents' use of denominations that Claimant has used for many years in that market.

126.  In light of this, the Panel asked the parties to address whether CAS has jurisdiction over such a claim.

127.  In response, Claimant contended that Respondents had never contested CAS jurisdiction over Claimant's UCA claim. This is not accurate, however. As Respondents reiterated at the hearing, they have contested CAS jurisdiction over the entirety of the parties' dispute throughout these proceedings.

128.  Claimant also said that Respondents' alleged unfair conduct has its "roots" in the Agreement because Respondents started using the denomination "World Championship" during the term of the Agreement and now continue to do so. Perhaps more to the point, however, is the fact that it was only due to the Agreement that Claimant came to have a sustained presence in the US market. To the extent US consumers have any material awareness of Claimant—an awareness that would be a predicate to the alleged confusion that underlies Claimant's UCA claim—they have it by virtue of Claimant's connection to Monster Energy AMA Supercross for over a decade further to the Agreement.

129.  In light of this, the Panel is satisfied that Claimant's UCA claim is one "arising from or related to" the Agreement and therefore within CAS's jurisdiction. For avoidance of doubt, this finding only concerns the civil claim Claimant has brought under the UCA in these proceedings. No party has raised any administrative or criminal issues under the UCA in this arbitration.



TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

### C.    Jurisdiction over FE

130.    Neither FE nor FMS is a signatory to the Agreement containing the arbitration clause.  For avoidance of doubt, Respondents do not contest that FMS became a party to the Agreement and the arbitration clause it contains by virtue of the transactions associated with FE's acquisition of Live Nation in September 2008.  Respondents do, however, contest that FE was ever a party to the Agreement or the arbitration clause it contains for the reasons set out above.

131.    Under Swiss law, in principle, an arbitration clause included in a main contract is only binding on the contracting parties  (Federal Tribunal, 4P_115/2003, 16 Oct. 2003, BGE 129 III 729, para. 5.3.1).

132.    However, a non-signatory can be bound by an arbitration clause if it intervened in the performance of the main contract in a way that the party asserting jurisdiction had legitimate reasons to assume in good faith that the non-signatory intended to become a party to the main contract and the arbitration clause it contains (*id.*; Federal Tribunal, 4A_128/2008, 19 Aug. 2008, BGE 134 III 567, para. 3.2).

133.    The proposal to bind a non-signatory cannot be accepted lightly, however.  Swiss courts apply a high evidentiary threshold and require clear evidence that the non-signatory intended to be bound by the main contract and the arbitration clause.

134.    Here, based on the submissions made and the evidence offered, the Panel is satisfied that Claimant has met this threshold.

135.    As a preliminary matter, the Panel notes that there is no dispute that FE was aware of the terms of the Agreement and the arbitration clause it contains.

136.    Although FMS is legally a subsidiary of FE, it appears from the record that in practice it operates merely as a division of FE.

137.    Perhaps most tellingly, FMS does not have any employees.  Respondents have suggested that this is somehow because FE handles payroll for all of its subsidiaries.  This is not what is happening, however.  FE is not handling payroll for FMS.  FE is handling its own payroll for its own employees.  All of the people who participated in the performance of the Agreement on Respondents' side were employees of FE.  No employees of FMS ever did anything with respect to the Agreement because there are none.

138.    Moreover, the record reflects that the people at FE handling the Agreement consistently identified themselves to Claimant as working for FE through their email handle (@feldinc.com) and their signature blocks.  Indeed, the Panel has only been able to find one document in the record that appears on FMS letterhead.  It is Exhibit R30, which is the letter declining Claimant's offer to extend the term of the Agreement.  Even this letter, however, confirms the Panel's understanding that FMS functions as a division of FE rather than as a subsidiary.  In fact, the FMS logo at the top left-hand corner of the page is followed by the statement, "A DIVISION OF FELD ENTERTAINMENT, INC."


COPY CERTIFIED CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

139. In addition, there is no dispute that FE—not FMS—held the registrations for the domain names used to promote Monster Energy AMA Supercross during the term of the Agreement.

140. Further, while there is some dispute as to whether FE jointly issued the 2019 Supplement Regulations with Claimant and the AMA, the FE logo—not the FMS logo—appears at the top of every page.

141. For over a decade, Claimant addressed its invoices for annual fees under the Agreement to FE—not FMS—and there is no evidence that FE ever objected to this. It appears that FE most often paid Claimant's invoices out of FMS accounts, though it sometimes paid them out of FE accounts, as well.

142. Given this history, it is not surprising that FE—not FMS—thanked Claimant for its "years of partnership and support" in the press release announcing the expiry of the Agreement. That press release was prepared by FE, which is listed as the "Media Contact" at the top of the first page. Although it is styled as an announcement of FMS, it is at best an announcement of FE on behalf of FMS. At the end of the press release—where the relevant companies are customarily listed and described—FMS is not even mentioned. FE is, though. And it describes Monster Energy AMA Supercross as one of its properties—not as a property of FMS.

143. In these circumstances, it is understandable that, to Claimant, FE and FMS were "indistinguishable" and Claimant was in good faith entitled to infer that FE was also bound by the Agreement and the arbitration clause it contains. FE acted as a party— enjoying rights and fulfilling obligations under the Agreement—almost always in its own name and for the benefit of its own brand. It cannot now decline the obligation to arbitrate disputes arising out of or related to that same Agreement.

144. Upon careful review of the parties' arguments and the evidence they have submitted, the Panel is satisfied that it has jurisdiction over the entirety of the parties' dispute.

## VI. APPLICABLE LAW

145. Under Article R45 of the CAS Code, the Panel shall decide the dispute according to the rules of law chosen by the parties or, in the absence of such choice, according to Swiss law. The parties may also authorize the Panel to decide *ex aequo et bono*.

146. As set out above, the Agreement at issue here provides in Clause 14 that it shall be subject to Swiss law.

147. The parties have not authorized the Panel to decide *ex aequo et bono*.


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

## VII.   MERITS

148.   The Panel now considers the merits of Claimant's claims for (A) breach of contract and (B) breach of the Swiss Unfair Competition Act in turn below.

### A.   Claim for Breach of Contract

149.   As detailed above, Claimant contends that it has exclusive rights under Clause 6 of the Agreement and Article 3 of the FIM Statutes to use "FIM", as well as the denominations "World", "World Title(s)", "World Champion(s)", "World Championship(s)", "Champion(s) of the World", "Championship(s) of the World", "Grand Prix" and "GP" ("**Contested Denominations**"). Claimant contends that Respondents have breached Clause 10.4 of the Agreement by using "FIM" and the Contested Denominations since the expiry of the Agreement. In light of this breach, Claimant contends that the Panel should issue an award (1) holding Respondents liable for damages, (2) ordering Respondents to cease using "FIM" and the Contested Denominations and (3) ordering Respondents to transfer to Claimant trademarks and names they registered during the term of the Agreement, as well as the domain names "fimsupercross.com", "worldsupercross.com", "supercrossgrandprix.com" and "supercrossgp.com".

150.   The Panel agrees in part.

151.   As a preliminary matter, the Panel notes that, although the Agreement as originally signed by Claimant and DOR concerned both motocross and supercross, it had been amended to concern only supercross by the time Respondents assumed it in 2008. Moreover, there is no dispute between the parties that, following the expiry of the Agreement, Respondents should refrain from using "FIM". In light of these observations, the Panel's discussion of Claimant's claim for breach of contract speaks principally in terms of supercross and the Contested Denominations.

152.   For the reasons explained above, the Panel interprets the Agreement in accordance with Swiss law, which in the circumstances of this case means interpreting the Agreement objectively and in accordance with the principle of good faith.

153.   As set out above, by its terms, the Agreement is one under which Claimant engaged DOR to market and promote the Supercross World Championship. DOR paid Claimant an annual fee for the opportunity to do so and, in exchange, got to keep the proceeds generated from the event.

154.   Claimant has characterized the Agreement as a license agreement, but the issues at stake in this case do not hinge on the characterization of the Agreement. The Agreement is an "innominate contract" under Swiss law that does not correspond to one of the types of contract expressly regulated by the Swiss Code of Obligations. There is no dispute that DOR (and later Respondents) could use the Contested Denominations during the term of the Agreement. And DOR (and later Respondents) did in fact pay Claimant the required annual fee and organize and promote Supercross World Championship events further to and in accordance


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

with Claimant's rules and regulations, as established further to the FIM Statutes, during the term of the Agreement.

155.    Contrary to what Claimant contends, however, it is not entirely clear that Clause 6 of the Agreement was meant to incorporate the FIM Statutes by reference into the Agreement. By its terms, Clause 6 rather provides that Respondents must observe, among other things, the FIM Statutes when fulfilling their obligations under the Agreement. In all events, however, Clause 6 expressly precludes Claimant from making any claims against Respondents for their failure to observe the FIM Statutes unless it has sent the relevant text to Respondents. There is no evidence that Claimant ever did so. Claimant's reliance on Clause 6 of the Agreement and Article 3 of the FIM Statutes is accordingly misplaced. (To the extent Claimant relies on Article 10.7 of the FIM Sporting Code, its reliance would also be misplaced for the same reasons.)

156.    Claimant resists this conclusion by contending that Respondents were aware of the FIM Statutes. That Respondents were aware that the FIM Statutes existed cannot be gainsaid because they are expressly mentioned in the terms of the Agreement. Whether Respondents were aware of their content is another matter. However, as Supercross World Championship events were sanctioned by Claimant further to the FIM Statutes and other FIM regulations, the Panel accepts that Respondents were aware of their content. Indeed, there is no dispute that Respondents organized events under the Agreement within Claimant's regulatory framework and in accordance with the FIM Sporting Code, Anti-Doping Code, Environmental Code, etc., as established further to the FIM Statutes. This awareness is not sufficient to give Claimant a claim under the Agreement based on the FIM Statutes *per se*, however, for the reasons explained above.

157.    In addition, Article 3 of the FIM Statutes does not purport to give Claimant exclusive rights to the Contested Denominations as Claimant contends. Article 3 rather says that the "official titles of World Championships" are the "exclusive property of the FIM in all disciplines of motorcycling sport." The official title of the Supercross World Championship was "Monster Energy AMA Supercross—an FIM World Championship". Had Article 3 ever imposed any actionable obligations on Respondents—and, again, the Panel is not persuaded that it did—those obligations would have related to that official title, not to the Contested Denominations.

158.    Claimant likewise relies on a draft term sheet from 2009 between Claimant, DMG and the AMA that says that "official titles of World Championships (including the FIM Supercross World Championship) and FIM Prize Events are the exclusive ownership of the FIM in all disciplines of motorcycling sport." It is unclear how this document, which does not speak to the Agreement and to which Respondents (and their predecessors-in-interest) have no connection, could be relevant to our interpretation of the Agreement under Swiss law. Moreover, the draft expressly says that it is not binding and it does not address Claimant's alleged rights to the Contested Denominations in any event. It is also, in substance, not materially different from Article 3 of the FIM Statutes, the terms of which the Panel has already determined do not purport to give Claimant exclusive rights to the Contested Denominations.

COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

159. Moreover, any alleged obligations Respondents had further to Article 3 of the FIM Statutes ended when the Agreement expired at the end of June 2021 by virtue of Clause 10.4 of the Agreement. In resisting this conclusion, Claimant notes that Respondents' supercross events are sanctioned by the AMA. Since the AMA is a member of FIM and bound by the FIM Statutes, Claimant contends that Respondents are bound too. Claimant has not explained why this would be the case or offered any authority for its position and the Panel is aware of none.

160. The Panel notes that the only denominations mentioned in the Agreement are those associated with the marks in Appendix 1 and Appendix 2—namely, MX FIM MOTORCROSS WORLD CHAMPIONSHIP and SX FIM SUPERCROSS WORLD CHAMPIONSHIP. The Swiss registrations for both those marks expired during the term of the Agreement, however, and Claimant (rightly) does not rely on them in attempting to justify the relief it seeks in this case.

161. Having said all this, the Agreement is not, as Respondents would have it, a sanctioning agreement under which DOR agreed to pay Claimant the annual fee for sanctioning the Supercross World Championship. There is no evidence that DOR came to Claimant with the Supercross World Championship seeking sanctioning services. It rather appears that Claimant came to DOR with the Supercross World Championship seeking marketing and promotional services. There is no suggestion that DOR paid Claimant the annual fee for sanctioning services. DOR rather agreed to pay Claimant the annual fee for the right to promote the Supercross World Championship and retain the proceeds generated from the event.

162. Respondents apparently consider the Agreement a sanctioning agreement because the Clear Channel Assignment in December 2001 resolved the sanctioning issue Clear Channel had with the AMA at that time. This, however, has no bearing on the nature and purpose of the Agreement at the time it was negotiated and concluded. It also ignores Clear Channel's stated motivation to become a party to the Agreement—namely, to use it to elevate the US Supercross Championship "from a domestic championship to one that is worldwide"— something Clear Channel said was impossible without partners like Claimant and DOR.

163. At the time Claimant and DOR negotiated and concluded the Agreement, there was a longstanding convention in motorcycle sports for more than 50 years that Claimant—and only Claimant—described its events as "World Championship" events. There is no evidence that anybody else had ever done so. It was an established custom in the field. Any supercross "World Championship" was necessarily a FIM world championship.

164. Against this backdrop, it would have been common ground between Claimant and DOR that once the Agreement expired—and Claimant and DOR went their separate ways—DOR would not be marketing or promoting any future supercross event as a "World Championship". This implicit understanding informs how the Panel reads and interprets Clause 10.4 of the Agreement. In providing that, upon termination "all rights granted under this Agreement shall automatically revert to the FIM and DOR shall not have any rights or obligations herein pursuant to said Agreement", the Agreement is designed to restore the *status quo ante*, whereby Claimant would no longer benefit from DOR's services and DOR would no longer market and promote any supercross event as a "World Championship". In the Panel's view, this is the interpretation of Clause 10.4 that accords with the principle of good faith under Swiss law.



COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

165.    The convention described above persisted during the term of the Agreement. There is no evidence that anybody ever purported to hold a supercross world championship without Claimant at any time between 2001 and 2021. This stands in contrast to the practice in some other sports—such as boxing—where a variety of entities purport to hold world championship events. No such fragmentation existed in supercross through the term of the Agreement.

166.    Respondents stepped into DOR's shoes when they assumed the Agreement by virtue of FE's acquisition of Live Nation in 2008. Since the Agreement expired at the end of June 2021, Respondents have accordingly had a contractual obligation to cease and refrain from marketing or promoting any supercross event as a "World Championship". In the context of the relief sought in this case, this means that Respondents must cease and/or refrain from using any denominations comprising "FIM"—which (as noted above) Respondents have never contested—and/or "World" and/or "World Title" and/or "World Champion" and/or "World Championship" and/or "Champion of the World" and/or "Championship of the World" (together, **"World Denominations"**) in respect of supercross events, titles or status organized in the United States after 30 June 2021 in any form and on any support, including but not limited to gaming and video.

167.    And this is in fact what Respondents have done. Contrary to what Claimant says, there is no evidence that Respondents continue to act as if the Agreement were still on foot. The record rather demonstrates that Respondents worked more or less diligently to remove references to "FIM", "World Championship" and "world title" in their supercross content in the run-up to the expiry of the Agreement and were reasonably prompt in removing any references to those terms they had overlooked when Claimant brought them to their attention after the Agreement had expired. The Panel is satisfied that these oversights were inadvertent and *de minimis* and there is no evidence they caused Claimant any damage, monetary or otherwise. In these circumstances they do not provide a sufficient basis to declare that Respondents breached the Agreement or to make any award of damages.

168.    For avoidance of doubt, the Panel notes that the terms "Grand Prix" and "GP" do not necessarily connote a world championship event and Respondents accordingly have no obligation under the Agreement to cease and/or refrain from using them. Also, there is no evidence that Respondents ever registered any trademarks or names in relation with the Supercross World Championship during the term of the Agreement and there is accordingly nothing for Respondents to transfer to Claimant in this respect. And there is no obligation under the Agreement for Respondents to transfer to Claimant any domain names that may have been used in connection with the Supercross World Championship during the term of the Agreement. The Panel's decision that Respondents must cease and/or refrain from using "FIM" and the World Denominations in respect of supercross events, titles or status organized in the United States after 30 June 2021 merely requires them to cease and/or refrain from using the domain names "fimsupercross.com" and "worldsupercross.com", which the Panel likewise understands they have already done. Indeed, FE does not even hold the registration for "fimsupercross.com" anymore.

169.    Also, as noted above, the Agreement between Claimant and Respondents only concerned supercross. It did not concern any other motorcycle sports. To the extent Claimant considers that the Agreement could be read to create rights and impose obligations with respect to other


CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

motorcycle sports—including SuperMotocross, which did not even exist until after the Agreement had expired—the Panel rejects its position. There is no evidence that could support interpreting the Agreement to prohibit Respondents from organizing and promoting events in other disciplines that were not the subject of the Agreement.

170. Respondents resist the idea that they have any obligation to cease using the World Denominations in connection with supercross events in the US on the grounds that Claimant does not have exclusive rights to those denominations under US trademark law. It is undisputed that Claimant currently has no registered trademarks in the United States that cover the World Denominations, but this is neither here nor there because Respondents' obligation to refrain from using them stems from Clause 10.4 of the Agreement and not US trademark law.

171. Respondents also contend that Claimant never licensed the World Denominations to Respondents and Respondents therefore never had an obligation to cease using them upon the expiry of the Agreement. This too is irrelevant because our decision does not depend on Claimant's ever having licensed the World Denominations to Respondents.

172. Respondents also contend that they were never bound by the FIM Statutes. This too is irrelevant to our decision, as our decision is not based on the FIM Statutes.

**B.     Claim for Breach of the Swiss Unfair Competition Act**

173. Claimant contends that Respondents' use of "FIM" and the Contested Denominations violates Article 3 paragraphs 1(b), (c), (d) and (e) of the UCA. Specifically, Claimant contends that Respondents' conduct is likely to give rise to confusion on the part of the public, the riders and the media that Monster Energy AMA Supercross is still part of the FIM circuit or co-sanctioned by Claimant—confusion that Claimant may not be able to dispel even with an expensive advertising campaign. In addition, by describing their events as world championships, Respondents are giving inaccurate and misleading information that their events are sanctioned by Claimant. It also suggests that Monster Energy AMA Supercross is a substitute for or equivalent to WSX, which it is not because it is merely an event organized by a private company that does not adhere to Claimant's standards. In light of this, Claimant contends the Panel should issue an award granting it the same relief it sought in connection with its breach of contract claim.

174. The Panel disagrees.

175. As a preliminary matter, it is not immediately clear why the UCA should reach the activities of two US companies operating in the United States. Claimant considers it should further to Article 136(1) PILA because Respondents' alleged conduct exclusively affects Claimant's interests. Given that Claimant is not the only entity with a financial interest in WSX, and that Claimant contends that the riders, the media and the public are being misled, the Panel fails to see why Respondents' alleged conduct would exclusively affect Claimant's interests. In these circumstances, it would seem that US law should therefore apply further to Article 136(2) PILA as the law of the state where the unfair competition allegedly took place (Dasser


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

CAS 2022/O/8974 – Page 54

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

in *Basler Kommentar Internationales Privatrecht*, 4th ed. 2021, Art. 136 N 14: explaining that the "place where the customer is influenced is decisive").

176. The Panel likewise notes that the prohibition against using inaccurate titles under Article 3(1)(c) UCA applies to people who claim to have won a title they have not in fact won. It does not concern the titles that organizations choose to give to those who win competitions they organize and accordingly has no relevance to the issues in this case.

177. Claimant's claim under the UCA is premised on Respondents use of "FIM" and the Contested Denominations in connection with Monster Energy AMA Supercross in the United States. There is, however, no evidence that Respondents are currently doing so. And to the extent they did so following the expiry of the Agreement, the Panel has already found that they did so inadvertently on a handful of occasions that were remedied reasonably promptly. In these circumstances, they can provide no basis to find that Respondents circulated inaccurate or misleading information about Monster Energy AMA Supercross or created any risk of confusion on the part of the riders, the media or the public within the meaning of Articles 3(1)(b) and (d) UCA.

178. In fact, the parties' June 2021 press releases regarding the expiry of the Agreement were clear on their face and the specialized media thereafter issued articles that showed that they understood that the parties' relationship had come to an end and Claimant would no longer sanction Monster Energy AMA Supercross. While it appears that scattered media outlets and Suzuki Racing published content post-Agreement that associated Claimant with Monster Energy AMA Supercross, this appears more to evidence their failure to timely update their graphics packages and boilerplate text than confusion. Moreover, there is no evidence on record of the media or teams having made any such misstatements since May 2022.

179. Claimant resists this conclusion by pointing to a 2015 letter from FE to Claimant, in which FE expressed concern that Claimant's promotion of a non-FMS supercross event might "lead to confusion with consumers who currently recognize the Combined Championship as the supercross series affiliated with FIM." As this letter was (1) sent during the term of the Agreement, (2) over seven years ago and (3) concerns conduct different from that at issue here, the Panel fails to see how it could be material to the question of the likelihood of confusion in the US market today.

180. The Panel also fails to see how Respondents are comparing Monster Energy AMA Supercross to WSX in any way, much less in way that falls within the scope of Article 3(1)(e) UCA. Respondents do not mention Claimant or WSX in their advertising at all (Federal Tribunal, 4A_467/2007 | 4A_469/2007, 8 Feb. 2008, para. 4.3: explaining that "exploitation of a reputation through advertising by reference within the meaning of Art. 3 lit. e UCA may consist in particular of the use of another's goods and services in one's own advertising in such a way that the image of the merchandise is transferred to one's own offers").

181. Claimant would have us accept that there is a material difference in the quality of Monster Energy AMA Supercross since it was co-sanctioned by Claimant and the AMA and now when it is sanctioned by the AMA alone. This has not been evidenced, however. On the contrary, the record indicates that there has been no material change in this respect.


COPIE CERTIFIÉE CONFORME
CERTIFIED TRUE COPY

CAS 2022/O/8974 – Page 55

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

182.   Claimant's claim under the UCA is accordingly dismissed.

### C.   Conclusion

183.   Based on the above analysis, the Panel is satisfied that it should grant Claimant's prayers for relief to the extent set out above.

184.   Our determination of Claimant's breach of contract claim is based on an objective interpretation of the Agreement in accordance with the principle of good faith. Claimant and Respondents had a productive collaboration under the Agreement promoting Monster Energy AMA Supercross as the Supercross World Championship under Claimant's umbrella for more than a decade. That Monster Energy AMA Supercross benefitted from being the Supercross World Championship during that time and continues to do so in light of that legacy cannot be gainsaid. To the extent Respondents consider that they can now proceed as if the Agreement had never existed at all, the Panel rejects their position for the reasons explained above.

185.   In light of the above analysis and conclusion, it is unnecessary for the Panel to consider any other arguments or requests submitted by the parties. All other motions or prayers for relief are accordingly dismissed.

## VIII.   Costs

186.   Article R64.4 of the CAS Code provides that:

*At the end of the proceedings, the CAS Court Office shall determine the final amount of the cost of arbitration, which shall include:*
- *the CAS Court Office fee,*
- *the administrative costs of the CAS calculated in accordance with the CAS scale,*
- *the costs and fees of the arbitrators,*
- *the fees of the* ad hoc *clerk, if any, calculated in accordance with the CAS fee scale,*
- *a contribution towards the expenses of the CAS, and*
- *the costs of witnesses, experts and interpreters.*

*The final account of the arbitration costs may either be included in the award or communicated separately to the parties. The advance of costs already paid by the parties are not reimbursed by the CAS with the exception of the portion which exceeds the total amount of the arbitration costs.*

187.   Article R64.5 of the CAS Code provides that:

*In the arbitral award, the Panel shall determine which party shall bear the arbitration costs or in which proportion the parties shall share them. As a general rule and without any specific request from the parties, the Panel has discretion to grant the prevailing party a contribution towards its legal fees and other expenses incurred in connection with the proceedings and, in particular, the costs of witnesses and interpreters. When granting such contribution, the Panel*


CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

*shall take into account the complexity and outcome of the proceedings, as well as the conduct and the financial resources of the parties.*

188. In light of the findings in this case, and given that neither side prevailed completely, the Panel considers that the cost of the present arbitration as determined in due course by the CAS Court Office should be borne by each side in equal shares.

189. Taking into account the complexity and outcome of these proceedings, as well as the conduct and financial resources of the parties, the Panel considers that each side should bear its own legal fees and other expenses incurred in connection with these proceedings.


CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

## ON THESE GROUNDS

**The Court of Arbitration for Sport rules that:**

1.  CAS has jurisdiction over the parties' dispute.

2.  Feld Entertainment, Inc. and Feld Motor Sports, Inc. are ordered jointly and severally to cease and/or refrain from using any denominations comprising "FIM" and/or "World" and/or "World Title" and/or "World Champion" and/or "World Championship" and/or "Champion of the World" and/or "Championship of the World" in respect of supercross events, titles or status organized in the United States after 30 June 2021 in any form and on any support, including but not limited to gaming and video, including in particular the following:







3.  The entire cost of the arbitration, to be determined and served to the parties by the CAS Court Office, shall be borne by each side in equal shares.

CERTIFIED TRUE COPY

TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE

4.  Each side shall bear its own legal fees and other expenses incurred in connection with these proceedings.

5.  All other motions or prayers for relief are dismissed.

Seat of arbitration: Lausanne, Switzerland
Date: 6 April 2023

## THE COURT OF ARBITRATION FOR SPORT

Jennifer Kirby
President of the Panel

Alexander McLin
Arbitrator

Michele A. R. Bernasconi
Arbitrator

CERTIFIED TRUE COPY



TAS / CAS
TRIBUNAL ARBITRAL DU SPORT
COURT OF ARBITRATION FOR SPORT
TRIBUNAL ARBITRAL DEL DEPORTE
Palais de Beaulieu
Av. Bergières 10 - CH-1004 Lausanne
Switzerland

CH - 1004

2176422

R Suisse



REÇU le
29 SEP. 2025

Mr Matthias Scherer
Ms Laura Azaria
Mr Thomas Widmer
LALIVE SA
Rue de la Mairie 35
1207 Genève, Switzerland

CASE POSTALE 6569/1211 GENEVE 6