# EXHIBIT O



Beilage Nr. _____ RL-2

# Part II: Commentary on the CAS Procedural Rules

## A. General Provisions (Arts. R27 – R37)

### Article R27: Application of the Rules

These Procedural Rules apply whenever the parties have agreed to refer a sports-related dispute to CAS. Such reference may arise out of an arbitration clause contained in a contract or regulations or by reason of a later arbitration agreement (ordinary arbitration proceedings) or may involve an appeal against a decision rendered by a federation, association or sports-related body where the statutes or regulations of such bodies, or a specific agreement provide for an appeal to CAS (appeal arbitration proceedings).

Such disputes may involve matters of principle relating to sport or matters of pecuniary or other interests relating to the practice or the development of sport and may include, more generally, any activity or matter related or connected to sport.

---

### I   PURPOSE OF THE PROVISION

Article R27 defines what rules apply if the parties agree to submit a dispute to the CAS. Furthermore, the provision specifies the requirements in order for the CAS to be competent and, consequently, the jurisdiction of the CAS to apply.[1] Finally, this provision indicates the two types of proceedings under the CAS Code: ordinary arbitration proceedings and appeal arbitration proceedings.[2]   1

### II   CONTENT OF THE PROVISION

### A   Applicability of the CAS Code

According to Art. R27(1), first sentence, the procedural rules contemplated in Arts. R27-R70 (the CAS Code) apply in all cases in which the parties have agreed to refer their sports-related disputes to the CAS.[3] This provision clarifies that arbitration proceedings at the CAS cannot be conducted under procedural rules other than those of the CAS Code. Nevertheless, special ad-hoc rules apply in case of ad-hoc arbitration proceedings at the Olympic Games, i.e., the "Arbitration Rules for the Olympic Games", which have been specifically drafted for the Olympics.[4]   2

---

[1]   CAS 2002/O/422, *Besiktas v. FIFA & SC Freiburg*, Award of 10 March 2003, para. 4.
[2]   See also Art. S12(3). The consultation proceedings (advisory opinion) have been discontinued in the course of the 2012 revision of the CAS Code effective as of 1 January 2012.
[3]   Confirmed by CAS jurisprudence, e.g., CAS 2008/A/1644, *M. v. Chelsea Football Club Ltd.*, Award of 31 July 2009, para. 10.
[4]   Cf. Reeb, pp. 177–186.

3   The CAS Code is amended or supplemented from time to time.[5] As a consequence, the question may arise as to which version should govern a given arbitration case before the CAS. If the arbitration agreement does not answer this question, the version in force at the time of the initiation of the arbitration proceedings shall be applicable, because, most often, the parties agree on the relevant institution in recognition of its reputation as an arbitral institution and not because of the speciflc provisions of its rules at the time of the conclusion of the arbitration agreement.[6] This means that the current rules, i.e., amended as of 1 January 2017, apply in principle to all procedures initiated by the CAS on or after 1 January 2017, even if another version of the CAS Code was in force at the time the arbitration agreement was concluded.[7]

4   The CAS Code may also apply independently of whether or not the CAS is competent to decide the dispute. For example, the parties may agree on an ad-hoc tribunal applying the CAS Code. If, however, the parties have agreed to the competence of the CAS, the latter will always apply the CAS Code. The question may arise whether or not the parties are entitled to deviate from, or substitute some of the provisions of the CAS Code. This is, in principle, admissible wherever the CAS Code (speciflcally) provides for the respective autonomy of the parties (e.g. time limits, Art. R49). In all other instances, one will have to differentiate between mandatory and non-mandatory provisions. Mandatory provisions are rules of the CAS Code on which "the arbitration system itself is built".[8] Accordingly, the CAS has a legitimate interest in upholding them without any changes.[9] Examples of such "mandatory" rules are the number of arbitrators assigned to an individual case, the "closed" list of CAS arbitrators who may be appointed to a case, the seat of the arbitral tribunal, the provision on costs of CAS proceedings, the scrutiny of the CAS award by the Secretary General (R59(2)), or the offlcial languages of the CAS. The parties cannot opt out of such provisions and at the same time submit the dispute to the CAS. If the parties wish to deviate from such (mandatory) rules they must resort to ad-hoc arbitration instead. It may be diffcult in an individual case to establish whether or not a speciflc provision of the CAS Code is mandatory. In essence, those provisions of the CAS Code are to be considered as mandatory that pertain to the "well-functioning" of the CAS as an arbitral institution. To state an example, the CAS has held that the "prohibition" of counterclaims in appeal arbitration proceedings is mandatory and that the parties cannot deviate from it.[10]

---

5   The CAS Code has been subject to seven revisions in recent years, i.e. the 2017 revision effective as of 1 January 2017, the 2016 revision effective as of 1 January 2016, the 2013 revision effective as of 1 March 2013, the 2012 revision effective as of 1 January 2012, the 2011 revision effective as of 1 January 2011, the 2010 revision effective as of 1 January 2010, and the 2004 revision effective as of 22 November 2004. For an overview on the 2013 revision, see Noth/Abegg, Neuerungen im CAS-Code 2013, Causa Sport 2013, pp. 112–117; Rigozzi/Hasler/Quinn, The 2011, 2012 and 2013 Revisions to the Code of Sports-Related Arbitration, *jusletter 3 June 2013*; on the 2012 revision see, e.g., Reeb, *CAS Bull 2012/1*, pp. 30–37; Kraehe, *SPuRt 2012*, p. 17. For an overview on the 2010 revision see, e.g., Rigozzi, *Jusletter 13 September 2010* or Reeb, *CAS Bull. 2010/1*, pp. 30–33.
6   BGer. 4P_253/2003 para. 5.4.
7   Cf. also Art. R67, flrst sentence. The procedures which are pending on 1 January 2017 remain subject to the rules in force before 1 January 2017, unless both parties request the application of the amended rules, cf. Art. R67, second sentence.
8   Beloff/Netzle/Haas, in Lewis/Taylor, para. E3.65.
9   CAS 2012/A/2943, *Bulgarian Chess Federation v. FIDE*, Award of 8 April 2013, para. 8.38.
10  CAS 2012/A/3031 *Katusha Management SA v. UCI*, Award of 15 February 2013, (referring to TAS 2010/A/2101), paras. 75–82.

*Article R27 CAS Code – Noth/Haas* 1435

In case the parties have modifled, or deviated from, a mandatory provision of the CAS Code, the question arises what consequences follow therefrom. According to Swiss legal doctrine, where the parties deviate from the fundamental rules of an arbitral institution, such modifled rules, if agreed-upon, shall not be considered null and void. However, the arbitral tribunal may nonetheless refuse to administer proceedings if the applicable procedural rules substantially deviate from the rules of the relevant institution.[11] In case of doubt, thus, the parties will preferably stick to the mandatory provisions of the CAS Code rather than having their case not administered and dealt with by the CAS. Where the agreement of the parties does not touch upon any mandatory provision of the CAS Code, questions of this kind need not be considered.[12] 5

The parties' autonomy to deviate from the CAS Code may not only be restricted by mandatory provisions of the CAS Code, but also by mandatory provisions or principles of international law (in particular Art. 6 ECHR) and/or by Art. 182(3) PILS and Art. 373(4) ZPO. Agreements on procedural issues, – existing, for instance, in the rules and regulations of a sport federation – thus, must not violate the principle of equal treatment, the principle of fair proceedings, the right to be heard or the principle of access to justice. This may require that a CAS Panel review the procedural agreement of the parties, in particular in cases of unequal bargaining power.[13] On this basis, rules derogating from the CAS Code by (a) imposing an extremely short deadline of appeal or (b) a unilateral requirement for a member to reveal third-party funding when bringing proceedings against an association; or by (c) requiring security for costs from every member bringing an appeal against a federation, regardless of their flnancial situation; or (d) providing for unequal rights to claim costs in proceedings may be declared null and void, depending on the manner in which they were drafted and on whether or not there are good reasons of administration of justice to justify such rules.[14] Furthermore, it should be noted that the formal requirements for an arbitration agreement to be valid are not applicable to procedural agreements. 6

In case the CAS Code contains a lacuna or remains silent on a speciflc issue, Swiss procedural law (ZPO) does not apply by default (unless the parties have agreed otherwise).[15] Instead, the procedure is to be determined by the Panel sitting in the matter at hand (Art. 182(2) PILS). In exercising its discretion how to flll the procedural lacuna, the Panel may look at principles of Swiss procedural law as a source of inspiration.[16] However, caution should be exercised when applying principles of Swiss civil procedure. This concerns, inter alia, the requirement for a party to have a "legal interest" ("Rechtsschutzinteresse", "intérêt légitime") when asking for declaratory relief.[17] The respective threshold in Swiss civil procedure is particularly 7

---

11  Kaufmann-Kohler/Rigozzi, paras. 6.53 et seq.
12  CAS 2012/A/2943, *Bulgarian Chess Federation v. FIDE*, Award of 8 April 2013, para. 8.39.
13  Beloff/Netzle/Haas, in Lewis/Taylor, para. E3.66.
14  CAS 2012/A/2943, *Bulgarian Chess Federation v. FIDE*, Award of 8 April 2013, paras. 8.44–8.55; CAS 2008/A/1782, *Volandri v. ITF*, Award of 30 March 2009, para. 70; CAS 2012/A/3031, *Katusha Management SA v. UCI*, Award of 15 February 2013, para. 68.
15  Beloff/Netzle/Haas, in Lewis/Taylor, para. E3.61.
16  CAS 2009/A/1879, *Alejandro Valverde Belmonte v. CONI et al.*, Award of 16 March 2010, para. 135.
17  The legal interest – according to recent jurisprudence by the Swiss Federal Supreme Court – is a matter of procedure governed by the *lex fori*, BGer 5A_88/2011, para. 4.

high,[18] flrst and foremost due to public interests, i.e., to restrict the case load for the courts. This is clearly evidenced by the fact that the courts examine this (procedural) condition *sua sponte*. However, it is obvious that such aspects of public interest are of little concern in an arbitration proceeding and that, in general, conditions provided for in civil procedure cannot always be applied mutatis mutandis to arbitration.[19]

**B      Jurisdiction of the CAS**

*1      The Power of CAS Panels to Decide on Their Jurisdiction*

8   According to Art. 186(1) PILS and Art. 359 ZPO, arbitral tribunals have the power to decide on their own jurisdiction (so called *competence-competence*). This principle belongs to the mandatory rules of the Swiss *lex arbitri*,[20] and may be considered an internationally recognized standard.[21] Since the 2012 revision of the CAS Code, effective as from 1 January 2012, it has been enshrined in Arts. R39 and R55 of the CAS Code. However, this principle was already expressly recognized by CAS jurisprudence before this revision.[22] The Panel may decide on its jurisdiction in an interlocutory decision (Art. 186(3) PILS or Art. 359(1) ZPO) or in the flnal award.[23]

9   Pursuant to Art. R27(1), the CAS may afflrm its jurisdiction provided there is a valid arbitration agreement referring the sports-related dispute to the CAS. The arbitration agreement is valid[24] if (i) the parties have agreed on the essential elements (*essentialia negotii*), (ii) the formal requirements regarding the agreement are met, (iii) the subject-matter of the dispute can effectively be submitted to arbitration (objective arbitrability),[25] and (iv) the parties had the capacity to enter into a binding arbitration agreement (subjective arbitrability[26]).[27] The main effect of a valid arbitration agreement is to exclude the jurisdiction of State courts in favor of dispute

---

18   For a comparative analysis of the (very strict) Swiss jurisprudence with reference to Art. 88 CCP, see Haas, in FS Gottwald, 2014, pp. 215 et seq.
19   Cf. Girsberger/Voser, *2016*, para. 1194.
20   Kaufmann-Kohler/Rigozzi, paras. 5.09 *seq*; Mavromati/Reeb, Art. R27, para. 23 et seq.; Poudret/Besson, para. 462; Berger/Kellerhals, para. 670.
21   Berger/Kellerhals, paras. 664 and 666.
22   E.g., CAS 2009/A/1910, *Telecom Egypt Club v. EFA*, Award of 9 September 2010, para. 2; CAS 2005/A/952, *Cole v. FALP*, Award of 24 January 2006, para. 3*;* CAS 2004/A/748, *ROC & Ekimov v. IOC, USOC & Hamilton*, Award of 27 June 2006, para. 6.
23   Beloff/Netzle/Haas, in Lewis/Taylor, para. E3.50.
24   The validity of the arbitration agreement must be examined separately from the validity of the main contract (principle of separability), cf. Art. 178(3) PILS and Art. 357(2) ZPO stating that the validity of an arbitration agreement may not be challenged on the grounds that the main contract between the parties is not valid.
25   Cf. Art. 177(1) PILS and Art. 354 ZPO. According to Art. 177(1) PILS all pecuniary claims are arbitrable. In general, the pecuniary nature of a claim is interpreted rather liberally (including disciplinary matters, BGer 4P.172/2006, para. 3.2), Girsberger/Voser, *2016*, para. 1924. It is common ground among legal scholars that the rules on arbitrability belong to the mandatory rules of the applicable *lex arbitri*, cf. Berger/Kellerhals, paras. 208 et seq.; as all CAS arbitrations have their seat in Switzerland, arbitrability is exclusively governed by the Swiss *lex arbitri*. For details regarding objective arbitrability see Rigozzi, *ASA Bull. 2003*, pp. 501–537.
26   This requirement is of particular importance with regard to athletes who are under age.
27   Regarding these requirements cf. Kohler-Kaufmann/Rigozzi, para. 5.01; Berger/Kellerhals, paras. 344 et seq.; Girsberger/Voser, *2016*, paras. 274 *et seq*.

*Article R27 CAS Code – Noth/Haas* 1437

resolution before an arbitral tribunal.[28] The examination of the Panel concerning its jurisdiction is not restricted by the "theory of double relevancy".[29] The Swiss Federal Supreme Court has explicitly stated that this theory, which limits a court's scope of review, is not applicable in the context of arbitration.[30]

### 2  Essentialia Negotii *of an Arbitration Agreement*

In an agreement establishing the jurisdiction of the CAS the parties need to express a mutual assent to submitting any disputes between them to the CAS.[31] Thus, the essential elements (*essentialia negotii*) of such an agreement are the following:[32] (i) It has to unambiguously mention that the parties wish their disputes to be settled by arbitration, and (ii) it has to deflne the scope of the disputes to be submitted to arbitration, either by specifying the disputes or by generally referring any dispute in connection with a particular relationship to arbitration. Furthermore, the arbitration agreement has to refer to the CAS as the competent court.[33] Whether the above conditions are fulfllled must be established according to the conflict of law provision in Art. 178(2) PILS, which deals with the substantive validity of the arbitration agreement. Inasfar as Swiss law applies the contents of the agreement has to be determined by interpretation.[34] According thereto, the arbitral tribunal must flrst determine the real intent of the parties (Art. 18 para. 1 CO). If it is not possible to establish such a real and common intent, the agreement is to be construed objectively, according to the so-called principle of mutual trust, namely to identify the meaning that the parties could and should give, according to the rules of good faith, to their mutual declarations of intention.[35] In addition to the minimum requirement in terms of content, the arbitration agreement should preferably also govern the language of the arbitration as well as the number of arbitrators and the procedure for their appointment.[36]

10

---

28 Berger/Kellerhals, para. 494; Girsberger/Voser, *2016*, paras. 494 et seq.; Kaufmann-Kohler/Rigozzi, para. 3.32.
29 Principle according to which whenever the decision on jurisdiction/admissibility of the claim pre-judges the outcome of the dispute on the merits, the full legal review of the doubly relevant facts must be performed at the stage of the decision on the merits only, BGE 122 II 252; BGE 119 II 66, para. 2a.
30 BGE 131 III 153, para. 5.1.
31 Cf. Art. 178(2) PILS; BGer. 4P.253/2003 para. 5.3; BGer. 4A_548/2009 para. 4.2.2. The lack of an athlete's consent does not per se invalidate an arbitration agreement that results from the athlete's participation in sporting activities, BGE 133 III 235 (*Canas v. ATP*) para. 4.3.2.3; regarding arbitration agreements by reference, see also the following paragraph and Art. R47, paras. 26–29 below.
32 Cf. BGE 129 III 675, para. 2.3; BGer 4A_246/2011, para. 2.1 et seq.; CAS 2015/A/3959, *CD Universidad Católica & Cruzados SADP v. Genoa Cricket and Football Club*, Award of 27 November 2015, para. 97.
33 Cf. BGer. 4P.253/2003 para. 5.1; BGE 130 III 66 para. 3.1; cf. also Mavromati, *CAS Bull. 2011/1*, p. 33. With regard to the form requirements concerning the *essentialia negotii* see the following paragraph.
34 BGE 130 III 66, para. 3.2; Poudret/Besson, para. 304.
35 BGE 130 III 66, para. 3.2; BSK-IPRG/Gränicher, Art. 178 para. 52a; Mavromati/Reeb, Art. R27, para. 69; CAS 2015/A/3959, *CD Universidad Católica & Cruzados SADP v. Genoa Cricket and Football Club*, Award of 27 November 2015, para. 95.
36 Cf. Berger/Kellerhals, para. 306; Kaufmann-Kohler/Rigozzi, para. 3.24.

*a*      *Referral to the CAS as Competent Court*

11   Under Swiss law, the parties are presumed to choose arbitration as such and not because of the identity of the arbitrator. Hence, the identity of the arbitrator is generally not considered an essential element of an arbitration agreement. Instead, it suffices that the arbitral tribunal is determinable.[37] In cases in which the CAS is not explicitly mentioned in the arbitration agreement, or where an institution is mentioned that will not or cannot exercise arbitral functions, it may become necessary to interpret the arbitration agreement in order to assess whether or not the parties wished to confer jurisdiction to the CAS. The Swiss Federal Supreme Court has held that a clause providing that the *"competent instance in case of a dispute concerning this Agreement is the FIFA Commission, or the UEFA Commission, which will have to decide the dispute that could arise between the club and the agent"* ultimately confers jurisdiction to the CAS.[38] The Swiss Federal Supreme Court reasoned as follows: *"Without breaching federal law the CAS found that the Parties wanted to submit their dispute to an arbitral tribunal sitting in Switzerland, which would know sport law particularly well. The designation of FIFA as well as UEFA suggests that the Parties wanted to have a sport body decide their possible disputes under the transfer contract, which would be familiar with transfers in the business of international football. It must be noticed in particular that the CAS can review FIFA decisions concerning the transfer of players on appeal and the Appellant itself acknowledges that an appeal to the CAS would have been allowed against the decision of the FIFA Committee for the Status of Players if it had accepted jurisdiction in the case at hand. On the basis of these circumstances it must be assumed that the Parties would have submitted the possible disputes arising from their transfer agreement […] to the CAS, which regularly addresses transfers of football players, had they known that the bodies mentioned in article 4 would not have jurisdiction."* Similarly, a CAS Panel found that a clause stating that *"In case of litigation of the Contract, the case shall be submitted to CFA or FIFA for arbitration"* conferred jurisdiction to the CAS.[39] Of course, all these problems can be avoided from the outset if the parties use the standard arbitration clause, which can be found in the appendices of the CAS Code as well as on the CAS website.[40]

*b*      *Consent to Arbitrate*

12   As a mandatory requirement of an arbitration agreement the parties need to unambiguously express the wish that their disputes be settled by arbitration and, thus,

---

37   BGer 129 III 675 para. 2.3; BGer 4A_246/2011 paras. 2.1 et seq.; BSK-IPRG-Gränicher, Art. 178 para. 30; Berger/Kellerhals, para. 285; cf. also CAS 2015/A/3959, *CD Universidad Católica & Cruzados SADP v. Genoa Cricket and Football Club*, Award of 27 November 2015, para. 99.
38   BGer 4A_246/2011, para. 2.3.3; see also Mavromati/Reeb, Art. R27, para. 41.
39   CAS 2015/A/3910, *Ana Kuže v. Tianjin TEDA FC*, Award of 20 November 2015, paras. 82 et seq.; see also the case CAS 2015/A/3959 *CD Universidad Católica & Cruzados SADP v. Genoa Cricket and Football Club*, Award of 27 November 2015, where the following clause was contained in the contract: *"The parties agree that any difficulty arising among them because of the application, performance, default, validity, invalidity, interpretation or other difficulty arising herefrom shall be resolved by the Fédération Internationale de Football Association (FIFA) as an arbitrator ex aequo et bono or amiable compositeur. There shall be no remedies against the decision thereof and the parties undertake to abide by the ruling rendered by such association, to which they grant due competence."*
40   Mavromati/Reeb, Art. R27, para. 37.

to the exclusion of state courts.[41] According to Art. R27(1), second sentence, such wish may be expressed either in the form of an arbitration clause contained in a contract or in regulations, or in the form of a later arbitration agreement (ordinary arbitration proceedings); such an agreement may further exist based on statutes,[42] regulations or a specific agreement to the effect that any appeal against a decision by sports-related bodies is to be brought before the CAS (appeal arbitration proceedings).

With regard to whether there is a will of the parties to arbitrate, the Swiss Federal Supreme Court has repeatedly stated that, as a principle, it applies a "benevolent" standard in sports arbitration, in order to encourage the speedy resolution of disputes by specialized arbitral tribunals presenting sufficient guarantees of independence and impartiality, such as the CAS.[43] However, it should be noted that the same "benevolence" does not apply to sports arbitration in general. So far the Swiss Federal Supreme Court has only expressed "benevolence" in two case groups. One case group concerns the arbitration clause by (general) reference.[44] The central issue here is, whether or not there is (unambiguous) consent between the parties to resort to arbitration.[45] This question must be resolved through the principle of good faith.[46] According to the Swiss Federal Supreme Court, arbitration is the typical dispute resolution mechanism of the sports industry, which must be taken into account when determining the will of the parties.[47] Accordingly, the Swiss Federal Supreme Court has found that "*a general reference to the FIFA Rules [in the Statutes of a National Federation] and thus to the appeal rights of FIFA and WADA contained in the FIFA Statutes [to the CAS] is sufficient to establish the jurisdiction of the CAS …*".[48] Thus, the threshold to assume consent to arbitrate in a sports context is particularly low with regard to arbitration clauses by reference.[49] 13

The other case group where the Swiss Federal Supreme Court has shown "benevolence" deals with so-called "forced arbitration clauses".[50] It is a characteristic feature of sports arbitration that one of the parties to the arbitration agreement (e.g. a club or an athlete) has no free choice whether to accept the arbitration clause or not. Instead, due to the monopolistic structure within sport, the contracting party may only choose to submit itself to arbitration or else not to participate in a particular sport altogether. This may be a particularly hard choice for an athlete who exercises his or her sport professionally. However, the Swiss Federal Supreme Court has found that notwithstanding the unequal bargaining power between the parties in such cases there is – in a sports context – still sufficient "consent" to arbitrate, provided that 14

---

41 BGE 130 III 66, para. 3.1: "Another general condition for an arbitration agreement is the clarity and certainty with respect to the private jurisdiction …"; see also Art. 178 paras. 50 et seq.; Berger/Kellerhals, para. 289.
42 For a typical example of such statutes see, e.g., the FIFA Statutes, Arts. 66–68, UEFA Statutes, Arts. 60–63 and IOC Statutes, Art. 61.
43 BGer 4A_428/2011, para. 3.2.3, BGer. 4A_246/2011 para. 2.2.2; BGer. 4A_548/2009 para. 4.1; BGer. 4A_460/2008 para. 6.2; Rigozzi, paras. 832 et seq.
44 Mavromati/Reeb, Art. R27, para. 50 et seq.
45 See Art. 178 PILS paras. 61 *et seq.* ; Berger/Kellerhals, paras. 455 et seq.
46 See Art. 178 PILS para. 61; Mavromati/Reeb, Art. R27, para. 43.
47 BGer 4A_428/2011, para. 3.2.3: "*In other words, following the conclusions of another specialist in this area of law, there is in essence no elite sport without consent to arbitrate.*"
48 BGer 4A_60/2008, para. 6.2.
49 Haas, Zwangsschiedsgerichtsbarkeit im Sport und EMRK, Bull ASA 4/2014, 707, 709.
50 Cf. Haas, Zwangsschiedsgerichtsbarkeit im Sport und EMRK, Bull ASA 4/2014, 707, 711 *et seq.*

the arbitral institution is independent from the parties.[51] The Swiss Federal Supreme Court justifies its reasoning by a balancing of the parties' interests and flnds that the advantages of sports arbitration are in the parties' interest of administering justice.

### c    Deflned Scope of Dispute

15   The arbitration agreement must specify the subject-matter of the dispute, in terms of either the object or the legal relationship in dispute.[52] It follows from this prerequisite that global submissions to arbitration such as "all legal disputes which arise out of current and future legal relationships" are not permissible. Moreover, it also follows that it must be determinable and foreseeable whether or not a certain dispute is covered by an arbitration clause. Various problems in this respect may arise in connection with Art. 61(1) of the Olympic Charter (OC), which reads as follows: "*The decisions of the IOC are flnal. Any dispute relating to their application or interpretation may be resolved solely by the IOC Executive Board and, in certain cases, by arbitration before the Court of Arbitration for Sport (CAS)*." The meaning of the phrase "in certain cases" is hard to construe. The provision seems to convey that the decisions of the IOC are either "flnal" or that they may be resolved – inter alia – by the CAS. This is already a misconception, because all disputes are resolved at a flnal level either before the CAS or by a state court. In one way or the other, there must be access to justice for persons concerned by an IOC decision. In essence, Rule 61(1) OC thus regulates whether a dispute over an IOC decision ends up before the CAS or before state courts. Furthermore, there is no obvious understanding of the phrase "certain cases". In particular, it is unclear what aspect determines the competent forum: is it the "nature" of the decision, the sporting body issuing it, or rather the importance or size of the dispute? Certainly, Rule 61(1) OC cannot be interpreted to mean that either party – the IOC or its opponent in a particular dispute – may unilaterally choose whether to bring the case before the CAS. Rule 61(1) OC fails to identify the disputes that qualify as a "*certain case*" subject to CAS review. Since, therefore, the disputes covered by the arbitration clause cannot be determined, the clause does not qualify as a valid arbitration clause.[53]

### 3    *Formal Requirements*

16   The CAS Code does not set out whether an arbitration agreement needs to be in writing, or whether another form, such as an oral agreement, would be accepted under CAS rules. In *WADA v. NSAM & Cheah & Ng & Masitah*,[54] the Panel held that "an agreement to arbitrate may be concluded explicitly or tacitly and may result from the content of the pleadings submitted by the parties". In any event, the validity of an arbitration agreement must be determined in accordance with Art. 178(1)

---

51　BGE 133 III 235, para. 4.3.2.2; see also Haas, Zwangsschiedsgerichtsbarkeit im Sport und EMRK, ASA Bull. 4/2014, 707 et seq.; Beloff/Netzle/Haas, in Lewis/Taylor, para. E3.47; Girsberger/Voser, *2016*, para. 1928; *contra* Lukomski, Int Sports Law J 2013, 60 et seq.
52　See Art. 178 PILS paras. 48, 51 *seq*.
53　CAS 2011/A/2576, *Curacao Sport and Olympic Federation v. IOC*, Award of 31 August 2012, paras. 6.15 et seq.
54　CAS 2007/A/1395, *WADA v. NSAM & Cheah & Ng & Masitah*, Award of 31 March 2008, para. 51.

*Article R27 CAS Code – Noth/Haas* 1441

PILS[55] (international arbitration) and Art. 358 ZPO (domestic arbitration), which require an agreement in writing. Under the PILS, the understanding of the criterion "written form" is generally very broad, meaning that any kind of written expression of the parties will be capable of meeting the requirements of Art. 178(1) PILS. The formal requirements in Art. 178(1) PILS only apply to the essential elements of the arbitration agreement (*essentialia negotii,* supra para. 10).[56]

The parties' written statements may be expressed in one or in several documents.[57] For instance, an arbitration agreement may result from an exchange of letters between parties.[58] No personal signature is required in order to conform to the written form requirement under the PILS.[59] Even a simple reference to a document containing an arbitration clause may suffice to assume the existence of a valid arbitration agreement (arbitration agreement by reference).[60] An oral agreement satisfies the form requirements under the PILS only if it is subsequently confirmed in writing.[61] The form requirement includes all essential elements of the arbitration agreement.[62] If the CAS is referred to by an incorrect or imprecise denomination or description ("falsa demonstratio non nocet"), this does not invalidate the arbitration agreement.[63]    17

The Swiss Federal Supreme Court has furthermore highlighted – not only in the context of sports arbitration – that in certain circumstances the principle of good faith can substitute the formal requirements provided for in Art. 178(1) PILS.[64] This is particularly true in cases in which non-signatories are bound to an arbitration agreement (e.g. universal successor,[65] individual successor, contract to the benefit of third party,[66] etc.).[67] For the non-signatory to be thus bound it is sufficient, in this kind of situations, that the arbitration agreement comply with Art. 178(1) PILS between the contracting parties only.[68] The principle of good faith may substitute the formal requirements also in other instances,[69] notably, e.g., if the appellant sends its    18

---

55  This provision is a substantive rule of Swiss private international law and a mandatory provision of the Swiss *lex arbitri*, Berger/Kellerhals, para. 418 *seq*.
56  Girsberger/Voser, *2016*, para. 339.
57  Mavromati, *CAS Bull. 2011/1*, p. 33. Cf. CAS 2011/O/2574, *UEFA v. Olympique des Alpes SA/FC Sion*, Award of 31 January 2012, para. 241, where the statutes in conjunction with an entry form for a supranational league were considered as a binding arbitration clause.
58  CAS 2008/O/1483, *AHF, KzHF, KHA v. IHF*, Award of 20 May 2008, para. 4.
59  Girsberger/Voser, *2016*, para. 341; Berger/Kellerhals, paras. 422; Mavromati/Reeb, Art. R27, para. 30.
60  BGer. 4P.230/2000 para. 2a; BGer. 4P.253/2003 para. 5; BGer. 4A_460/2008 para. 6.2; regarding the well-known issues of the validity of arbitration agreements by reference, cf. Netzle, *ASA Special Series no. 11*, pp. 50–53; for examples of corresponding CAS jurisprudence, cf., e.g., Mavromati, *CAS Bull. 2011/1*, pp. 36–37.
61  Berger/Kellerhals, para. 426; it is, however, disputed whether the confirmation must be made by both parties or whether unilateral confirmation suffices, Girsberger/Voser, *2016*, paras. 343 *seq*; cf. also Kaufmann-Kohler/Rigozzi, para. 3.71.
62  Kaufmann-Kohler/Rigozzi, para. 3.58.
63  BGer. 4A_246/2011 para. 2.2.3 and 2.3, where the further context of the arbitration agreement allowed to interpret the "FIFA Commission, or the UEFA Commission" as the CAS.
64  BGer 4A_428, para. 3.2.3; BGE 129 III 727, para. 5.3.1.
65  CAS 2015/A/3910, *Ana Kuže v. Tianjin TEDA FC*, Award of 20 November 2015, para. 97; Berger/Kellerhals, para. 540; BSK-IPRG-Gränicher, Art. 178 para. 76.
66  BGer 4A_627/2011, para. 3.2.
67  Berger/Kellerhals, paras. 537 et seq.
68  See Berger/Kellerhals, para. 539.
69  Mavromati/Reeb, Art. R27, paras. 46 et seq.

statement of appeal to the CAS within the time limit.[70] Likewise, filing a cross-appeal is deemed an acknowledgement of CAS jurisdiction. The jurisdiction of the CAS is also established by signing the Order of Procedure stating that the CAS shall be competent to decide on the case.[71] However, a party appointing an arbitrator is not prevented from objecting to CAS jurisdiction provided the party expressly reserves such a right. A decision of a federation stating that this decision may be appealed before the CAS within 20 days of receiving notification is considered an offer to conclude an ad-hoc arbitration agreement.[72] Participation in a competition organized by a federation which in its regulations stipulates that any dispute shall be resolved by arbitration (= offer in writing) was considered an acceptance of the offer.[73]

### 4    Sports-related Disputes

19   Only sports-related disputes are covered by the CAS Code.[74] Such disputes must be of a private-law nature.[75] It is for the Court to assess whether a dispute is sports-related or not.[76] The IOC understanding of the concept of sports reflects the core notion of sports in the meaning of Art. R27.[77] However, sports that are not recognized by the IOC may also be covered by Art. R27. Difficult questions may arise with regard to leisure and entertainment activities such as bungee jumping, mental exercise competitions, e-games or card games.

20   In general, the CAS has a very broad understanding of sports and sports-relations.[78] Chess is also considered a sport in the meaning of the CAS Code.[79] The CAS also affirmed a sports-relation in a case in which an architect was commissioned by a boats company to participate in the development of sports boats;[80] whether the CAS is indeed the right platform for such purely commercial matters has been questioned by some authors.[81]

### 5    Lack of Funds

21   Even though the costs of an arbitration proceeding before the CAS are fairly low compared to commercial arbitration, the question may arise whether or not an arbitration agreement is inoperative from the perspective of an athlete because of lack of funds. In legal literature some advocate a right for a party's unilateral termination

---

70   CAS 2002/O/422, *Besiktas v. FIFA & SC Freiburg*, Award of 10 March 2003, para. 25.
71   Oschütz, p. 274; Netzle, *ASA Special Series no. 11*, p. 53.
72   Cf., e.g., CAS 2003/O/482, *Ortega v. Fenerbahce & FIFA*, Award of 5 November 2003, para. 4; CAS 2003/O/486, *Fulham FC v. Olympique Lyonnais*, Award of 15 September 2003, para. 3.
73   CAS 2009/A/1910, *Telecom Egypt Club v. EFA*, Award of 9 September 2010, para. 9.
74   Art. R27(2).
75   Oschütz, p. 83.
76   See in detail Mavromati/Reeb, Art. R27, paras. 88 et seq.
77   Cf. Rochat, *ASA Special Series no. 11*, p. 12 who considers the criteria of IOC's understanding of the notion of sports as relevant; similar Oschütz, p. 84.
78   Cf. McLaren, p. 37, the topics that the CAS addresses have constantly expanded to include a wider array of issues and sports; Sternheimer/Le Lay, *CAS Bull. 2012/1*, pp. 49, 52; cf. also Girsberger/Voser, *2016*, para. 1923.
79   Cf. CAS 2004/O/657 – unpublished decision regarding a chess player.
80   CAS 92/O/81, *L v. Y. SA*, Award of 30 November 1992, para. 3.
81   E.g., Rigozzi, paras. 933 and 934; in support of CAS Sternheimer/Le Lay, *CAS Bull. 2012/1*, p. 56.

*Article R27 CAS Code – Noth/Haas* 1443

of the arbitration agreement if it has proven to be unable to pay the arbitration costs, in order to avoid denial of access to justice for such party.[82] Unlike in state court proceedings there is, in principle, no (mandatory) legal aid before arbitral tribunals (either by direct application of the respective rules in civil procedure or following from the principle of equal treatment of the parties or on ordre public grounds).[83] In order to ensure that lack of funds does not jeopardize access to justice, the CAS Code provides for legal aid. According to Art. S6(9) ICAS is responsible for creating "*a legal aid fund to facilitate access to CAS arbitration for natural persons without sufflcient flnancial means*". The guidelines on legal aid[84] and the legal aid application form can be downloaded from the CAS website.[85] In the majority of the requests flled, the applicant is granted legal aid in some form or another.[86]

### C   Categories of Proceedings Before the CAS

22 Article R27(1) states that the CAS Code differentiates between two types of arbitration proceedings, i.e., ordinary arbitration proceedings, which are governed by Arts. R38-R46, and appeal arbitration proceedings, which in turn are governed by Arts. R47-R59.[87] Ordinary arbitration proceedings are – in most cases – similar to commercial arbitration;[88] whereas appeal arbitration proceedings are of a different, sports-speciflc nature. However, also ordinary arbitration proceedings may be very sport speciflc. For instance, Art. 8.5 of the World Anti-Doping Code provides that an anti-doping rule violation asserted against an athlete may, with the consent of the athlete, the anti-doping organization with results management responsibility, WADA and any other anti-doping organization that would have a right to appeal a flrst instance hearing decision, be heard directly at CAS with no requirement for a prior decision by the sports body. Such flrst instance CAS proceedings in doping matters would sometimes be conducted as ordinary arbitration[89] sometimes as appeals arbitration procedures.[90] In recent years, most CAS proceedings have been appeal proceedings.[91]

23 Arbitration proceedings submitted to the CAS are assigned by the CAS Court Offlce to the appropriate division.[92] The assignment is made on the basis of the Request for Arbitration / Statement of Appeal, i.e., at a very early stage of the proceedings in which the Respondent has not yet been heard.[93] Thus, the assignment is made depending on the subject matter in dispute (in particular the requests) as submitted

---

82  Berger/Kellerhals, para. 633; see also Kaufmann-Kohler/Rigozzi, para. 3.187; left undecided in BGer 4A_178/2014, para. 4.
83  BGer 4A_178/2014, para. 4.
84  http://www.tas-cas.org/flleadmin/user_upload/Legal_Aid_Rules_2016_ENG_.pdf.
85  http://www.tas-cas.org/flleadmin/user_upload/Legal20Aid20Form20_English_.pdf.
86  See the statistics in Mavromati/Reeb, para. VI C.
87  Cf. also Arts. S3(2) and S20(1).
88  Oschütz, p. 50; Kaufmann-Kohler/Bärtsch, p. 85; Sternheimer/Le Lay, *CAS Bull. 2012/1*, p. 52.
89  See for such an example CAS 2015/O/4128, *IAAF v. Rita Jeptoo*.
90  See for such an example CAS 2016/A/4707, *Alex Schwazer v. IAAF, NADO ITALIA, FIDAL & WADA*.
91  In the year 2013, 58 CAS cases concerned ordinary proceedings and 349 CAS cases appeal proceedings, cf. <http://www.tas-cas.org/flleadmin/user_upload/CAS_Statistics_2013.pdf.>.
92  Art. S20(2), flrst sentence.
93  Haas/Köppel, Abwehransprüche des Sportlers gegen (angeblich rechtswidriges) Verbandsverhalten vor dem Court of Arbitration for Sport (CAS/TAS), in jusletter 16 July 2012, paras. 31 seq.

to the CAS by the Appellant/Claimant.[94] If the subject matter ("*Streitgegenstand*") concerns an appeal against a decision of a sports organization, then the case will be assigned to the Appeals Arbitration Division, unless the validity/lawfulness of the contested decision is a purely preliminary question ("*Vorfrage*") of the dispute. The term "appeal" should be construed widely as it covers declaratory relief as well as modiflcatory relief ("*Gestaltungsklagen*").[95] Thus, in order for the matter to be assigned to the Appeals Arbitration Division, the appeal against the decision must be the core of the dispute.[96] This will not apply, for instance, if the Claimant flles a request for damages based on the alleged unlawfulness of a decision issued by a sports organization. If the Claimant / Appellant flles several requests pertaining to both divisions, the CAS Court Offlce may assign all claims to the Appeals Arbitration Division for reasons of procedural efflciency, provided that there is a factual or legal connection between the various claims. As a matter of principle, the assignment of the CAS Court Offlce may not be contested by the parties.[97] However, the parties may ask the CAS Court Offlce to reconsider its decision and the Court Offlce may agree to do so.[98] If both parties wish and agree to submit their dispute to the other Division, the CAS Court Offlce should modify its decision in any event.[99] Furthermore, in the event of a change of circumstances during the procedure, i.e. after the commencement of the proceedings, the CAS Court Offlce may re-assign the arbitration to the other division.[100] However, there is no "change of circumstances", if – in the course of the appeal proceedings – the Panel comes to the conclusion that based on the factual submissions of the parties there is in fact no decision that the Appellant is entitled to contest. In such circumstances the Panel may neither reject the appeal for lack of jurisdiction,[101] nor dismiss the appeal as inadmissible.[102] Since the CAS Court Offlce's assignment of the case to either of the two divisions is binding (on the parties and also on the arbitral tribunal)[103] and includes the applicability of the respective procedural rules, the Panel must dismiss the appeal on the merits.[104]

---

94  Haas/Köppel, in jusletter 16 July 2012, para. 22.
95  Haas/Köppel, in jusletter 16 July 2012, para. 35.
96  Haas/Köppel, in jusletter 16 July 2012, para. 35.
97  Art. S20(2), second sentence; cf. CAS 2004/A/748, *ROC & Ekimov v. IOC, USOC & Hamilton*, Award of 27 June 2006, para. 2.
98  Kaufmann-Kohler/Bärtsch, pp. 74–75.
99  Kaufmann-Kohler/Bärtsch, p. 75.
100 Art. S20(2), third sentence.
101 Haas/Köppel, in jusletter 16 July 2012, para. 30.
102 Haas/Köppel, in jusletter 16 July 2012, paras. 31 *et seq*.
103 CAS 2004/A/748, *Russian Olympic Committee (ROC) & Viatcheslav Ekimov v. International Olympic Committee (IOC), United States Olympic Committee (USOC) & Tyler Hamilton*, Award of 27 June 2006, para. 2: "*The Panel notes that, pursuant to Article S20 of the Code, the decision of the CAS Court Offlce as to the assignment of a case to either CAS Division is administrative in nature; no arguments are heard, no reasons are given, no appeal is allowed. The Panel must thus disregard the arguments put forward by the parties with respect to the characterization of this arbitration as an "appeal" or an "ordinary" arbitration. As the Court Offlce assigned this case to the Appeals Arbitration Division, the Panel must follow the set of Code provisions applicable to the appeal arbitration procedure.*"
104 See CAS 2014/A/3744&3766, *Nigerian Football Federation v. FIFA*, Award of 18 May 2015, para. 196.